# BUFFALO FORGE CO. *v.* UNITED STEELWORK-ERS OF AMERICA, AFL–CIO, ET AL.

No. 75–339.   Argued March 24, 1976—Decided July 6, 1976

*Jeremy V. Cohen* argued the cause and filed briefs for petitioner.

*George H. Cohen* argued the cause for respondents. With him on the brief were *Elliot Bredhoff, Michael H. Gottesman, Robert M. Weinberg, Bernard Kleiman, Carl Frankel, Thomas P. McMahon, J. Albert Woll,* and *Laurence S. Gold.\**

\*Briefs of *amici curiae* urging reversal were filed by *George R. Fearon* and *Charles E. Cooney, Jr.,* for Associated Industries of New York State, Inc.; by *Guy Farmer* and *William A. Gershuny* for Bituminous Coal Operators' Assn., Inc.; by *Lawrence B. Kraus,*

Mr. Justice White delivered the opinion of the Court.

The issue for decision is whether a federal court may enjoin a sympathy strike pending the arbitrator's decision as to whether the strike is forbidden by the express no-strike clause contained in the collective-bargaining contract to which the striking union is a party.

## I

The Buffalo Forge Co. (employer) operates three separate plant and office facilities in the Buffalo, N. Y., area. For some years production and maintenance (P&M) employees at the three locations have been represented by the United Steelworkers of America, AFL–CIO, and its Local Unions No. 1874 and No. 3732 (hereafter sometimes collectively the Union). The United Steelworkers is a party to the two separate collective-bargaining agreements between the locals and the employer. The contracts contain identical no-strike clauses,[1] as well as grievance and arbitration provisions

---

*Richard B. Berman, G. Brockwel Heylin, William J. Curtin,* and *Harry A. Rissetto* for the Chamber of Commerce of the United States; and by *Richard D. Godown* for the National Association of Manufacturers of the United States.

[1] Section 14.b. of each agreement provides:

"There shall be no strikes, work stoppages or interruption or impeding of work. No Officers or representatives of the Union shall authorize, instigate, aid or condone any such activities. No employee shall participate in any such activity. The Union recognizes its possible liabilities for violation of this provision and will use its influence to see that work stoppages are prevented. Unsuccessful efforts by Union officers or Union representatives to prevent and terminate conduct prohibited by this paragraph, will not be construed as 'aid' or 'condonation' of such conduct and shall not result in any disciplinary actions against the Officers, committeemen or stewards involved." App. 16.

for settling disputes over the interpretation and application of each contract. The latter provide:

> "26. Should differences arise between the [employer] and any employee covered by this Agreement as to the meaning and application of the provisions of this Agreement, or should any trouble of any kind arise in the plant, there shall be no suspension of work on account of such differences, but an earnest effort shall be made to settle such differences immediately [under the six-step grievance and arbitration procedure provided in sections 27 through 32]." [2]

Shortly before this dispute arose, the United Steelworkers and two other locals not parties to this litigation were certified to represent the employer's "office clerical-technical" (O&T) employees at the same three locations. On November 16, 1974, after several months of negotiations looking toward their first collective-bargaining agreement, the O&T employees struck and established picket lines at all three locations. On November 18, P&M employees at one plant refused to cross the O&T picket line for the day. Two days later, the employer learned that the P&M employees planned to stop work at all three plants the next morning. In telegrams to the Union, the employer stated its position that a strike by the P&M employees would violate the no-strike clause and offered to arbitrate any dispute

---

[2] *Id.*, at 17. The final step in the six-part grievance procedure is provided for in § 32:

"In the event the grievance involves a question as to the meaning and application of the provisions of this Agreement, and has not been previously satisfactorily adjusted, it may be submitted to arbitration upon written notice of the Union or the Company." *Id.*, at 19.

which had led to the planned strike.[3] The next day, at the Union's direction, the P&M employees honored the O&T picket line and stopped work at the three plants. They did not return to work until December 16, the first regular working day after the District Court denied the employer's prayer for a preliminary injunction.

The employer's complaint under § 301 (a) of the Labor Management Relations Act, 1947,[4] filed in District Court on November 26, claimed the work stoppage was in violation of the no-strike clause. Contending in the alternative that the work strike was caused by a specific incident involving P&M truck drivers' refusal to follow a supervisor's instructions to cross the O&T picket line. and that the question whether the P&M employees' work stoppage violated the no-strike clause was itself arbitrable, the employer requested damages, a temporary restraining order and a preliminary injunction against the strike, and an order compelling the parties to submit

[3] *Id.*, at 22–23. At oral argument before this Court, the parties disagreed whether the employer's telegrams were sufficient to submit the dispute to the contractual grievance procedures. Tr. of Oral Arg. 44–45, 48–50. The employer's complaint prayed for an order requiring arbitration of a dispute "relating to work performance of truck drivers or any other underlying dispute." App. 10. As far as the record indicates no grievance proceedings have taken place with respect to any aspect of the dispute. The Union apparently argued in the Court of Appeals that the employer was not entitled to an injunction because it failed to invoke the contractual grievance procedures. 517 F. 2d 1207, 1209 n. 4 (1975). Like the Court of Appeals, *ibid.*, we need not reach the issue under our disposition of the case.

[4] 61 Stat. 156, 29 U. S. C. § 185 (a). Section 301 (a) provides:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

any "underlying dispute" to the contractual grievance and arbitration procedures. The Union's position was that the work stoppage did not violate the no-strike clause.[5] It offered to submit that question to arbitration "on one day's notice," [6] but opposed the prayer for injunctive relief.

After denying the temporary restraining order and finding that the P&M work stoppage was not the result of the specific refusal to cross the O&T picket line, the District Court concluded that the P&M employees were engaged in a sympathy action in support of the striking O&T employees. The District Court then held itself forbidden to issue an injunction by § 4 of the Norris-LaGuardia Act [7] because the P&M employees' strike

---

[5] District Court Tr. 57; Memorandum for Respondent in District Court 9, 13.

[6] Id., at 9.

[7] Section 4 of the Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. § 104, provides:

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

"(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 3 of this Act;

"(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;

"(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;

"(e) Giving publicity to the existence of, or the facts involved in,

was not over an "arbitrable grievance" and hence was not within the "narrow" exception to the Norris-La-Guardia Act established in *Boys Markets* v. *Retail Clerks Union,* 398 U. S. 235 (1970). 386 F. Supp. 405 (WDNY 1974).

On the employer's appeal from the denial of a preliminary injunction, 28 U. S. C. § 1292 (a)(1), the parties stipulated that the District Court's findings of fact were correct, that the Union had authorized and directed the P&M employees' work stoppage, that the O&T employees' strike and picket line were bona fide, primary, and legal, and that the P&M employees' work stoppage, though ended, might "be resumed at any time in the near future at the direction of the International Union, or otherwise." [8]

The Court of Appeals affirmed. It held that enjoin-

---

any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

"(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

"(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

"(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 3 of this Act."

[8] App. 25. The presence of an existing dispute makes this a live controversy despite the P&M employees' return to the job. See *Super Tire Engineering Co.* v. *McCorkle,* 416 U. S. 115, 124–125 (1974); *Bus Employees* v. *Missouri,* 374 U. S. 74, 77–78 (1963). The collective-bargaining agreements in effect when this action arose have expired, but the parties have stipulated, App. 25, that they govern resolution of this dispute. On appeal the employer did not challenge the District Court's finding that the P&M employees' work stoppage was not, at least in part, a protest over truck driving assignments. 517 F. 2d, at 1211 n. 7.

ing this strike, which was not "over a grievance which the union has agreed to arbitrate," was not permitted by the *Boys Markets* exception to the Norris-LaGuardia Act. 517 F. 2d 1207, 1210 (CA2 1975). Because the Courts of Appeals are divided on the question whether such a strike may be enjoined,[9] we granted the employer's petition for a writ of certiorari, 423 U. S. 911 (1975), and now affirm the judgment of the Court of Appeals.

## II

As a preliminary matter, certain elements in this case are not in dispute. The Union has gone on strike not by

[9] The decision of the Second Circuit in this case is in accord with decisions of the Fifth and Sixth Circuits, *Amstar Corp.* v. *Meat Cutters,* 468 F. 2d 1372 (CA5 1972); *Plain Dealer Pub. Co.* v. *Cleveland Typographical Union,* 520 F. 2d 1220 (CA6 1975), cert. denied, *post,* p. 909; see *United States Steel Corp.* v. *Mine Workers,* 519 F. 2d 1236 (CA5 1975), reh. denied, 526 F. 2d 376 (1976), cert. denied, *post,* p. 910, but at odds with decisions of the Third, Fourth, and Eighth Circuits, *NAPA Pittsburgh, Inc.* v. *Automotive Chauffeurs,* 502 F. 2d 321 (CA3) (en banc), cert. denied, 419 U. S. 1049 (1974); *Island Creek Coal Co.* v. *Mine Workers,* 507 F. 2d 650 (CA3), cert. denied, 423 U. S. 877 (1975); *Armco Steel Corp.* v. *Mine Workers,* 505 F. 2d 1129 (CA4 1974), cert. denied, 423 U. S. 877 (1975); *Pilot Freight Carriers, Inc.* v. *Teamsters,* 497 F. 2d 311 (CA4), cert. denied, 419 U. S. 869 (1974); *Wilmington Shipping Co.* v. *Longshoremen,* 86 L. R. R. M. 2846 (CA4), cert. denied, 419 U. S. 1022 (1974); *Monongahela Power Co.* v. *Electrical Workers,* 484 F. 2d 1209 (CA4 1973); *Valmac Industries* v. *Food Handlers,* 519 F. 2d 263 (CA8 1975), cert. granted, vacated and remanded, *post,* p. 906; *Associated Gen. Contractors* v. *Operating Engineers,* 519 F. 2d 269 (CA8 1975). The Seventh Circuit has adopted an intermediate position. *Hyster Co.* v. *Independent Towing Assn.,* 519 F. 2d 89 (1975), cert. denied *sub nom. Hyster Co.* v. *Employees Assn. of Kewanee, post,* p. 910; *Gary Hobart Water Corp.* v. *NLRB,* 511 F. 2d 284, cert. denied, 423 U. S. 925 (1975). But cf. *Inland Steel Co.* v. *Mine Workers,* 505 F. 2d 293 (1974).

reason of any dispute it or any of its members has with the employer, but in support of other local unions of the same international organization, that were negotiating a contract with the employer and were out on strike. The parties involved here are bound by collective-bargaining contracts each containing a no-strike clause which the Union claims does not forbid sympathy strikes. The employer has the other view, its complaint in the District Court asserting that the work stoppage violated the no-strike clause. Each of the contracts between the parties also has an arbitration clause broad enough to reach not only disputes between the Union and the employer about other provisions in the contracts but also as to the meaning and application of the no-strike clause itself. Whether the sympathy strike the Union called violated the no-strike clause, and the appropriate remedies if it did, are subject to the agreed-upon dispute-settlement procedures of the contracts and are ultimately issues for the arbitrator. *Steelworkers* v. *American Mfg. Co.,* 363 U. S. 564 (1960); *Steelworkers* v. *Warrior & Gulf Co.,* 363 U. S. 574 (1960); *Steelworkers* v. *Enterprise Corp.,* 363 U. S. 593 (1960). The employer thus was entitled to invoke the arbitral process to determine the legality of the sympathy strike and to obtain a court order requiring the Union to arbitrate if the Union refused to do so. *Gateway Coal Co.* v. *Mine Workers,* 414 U. S. 368 (1974). Furthermore, were the issue arbitrated and the strike found illegal, the relevant federal statutes as construed in our cases would permit an injunction to enforce the arbitral decision. *Steelworkers* v. *Enterprise Corp., supra.*

The issue in this case arises because the employer not only asked for an order directing the Union to arbitrate but prayed that the strike itself be enjoined pending

arbitration and the arbitrator's decision whether the strike was permissible under the no-strike clause. Contrary to the Court of Appeals, the employer claims that despite the Norris-LaGuardia Act's ban on federal-court injunctions in labor disputes the District Court was empowered to enjoin the strike by § 301 of the Labor Management Relations Act as construed by *Boys Markets* v. *Retail Clerks Union, supra.* This would undoubtedly have been the case had the strike been precipitated by a dispute between union and management that was subject to binding arbitration under the provisions of the contracts. In *Boys Markets,* the union demanded that supervisory employees cease performing tasks claimed by the union to be union work. The union struck when the demand was rejected. The dispute was of the kind subject to the grievance and arbitration clauses contained in the collective-bargaining contract, and it was also clear that the strike violated the no-strike clause accompanying the arbitration provisions. The Court held that the union could be enjoined from striking over a dispute which it was bound to arbitrate at the employer's behest.

The holding in *Boys Markets* was said to be a "narrow one," dealing only with the situation in which the collective-bargaining contract contained mandatory grievance and arbitration procedures. *Id.,* at 253. "[F]or the guidance of the district courts in determining whether to grant injunctive relief," the Court expressly adopted the principles enunciated in the dissent in *Sinclair Refining Co.* v. *Atkinson,* 370 U. S. 195, 228 (1962), including the proposition that

> " '[w]hen a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may

issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike.' " 398 U. S., at 254 (emphasis in *Sinclair*).

The driving force behind *Boys Markets* was to implement the strong congressional preference for the private dispute settlement mechanisms agreed upon by the parties. Only to that extent was it held necessary to accommodate § 4 of the Norris-LaGuardia Act to § 301 of the Labor Management Relations Act and to lift the former's ban against the issuance of injunctions in labor disputes. Striking over an arbitrable dispute would interfere with and frustrate the arbitral processes by which the parties had chosen to settle a dispute. The *quid pro quo* for the employer's promise to arbitrate was the union's obligation not to strike over issues that were subject to the arbitration machinery. Even in the absence of an express no-strike clause, an undertaking not to strike would be implied where the strike was over an otherwise arbitrable dispute. *Gateway Coal Co.* v. *Mine Workers, supra; Teamsters* v. *Lucas Flour Co.*, 369 U. S. 95 (1962). Otherwise, the employer would be deprived of his bargain and the policy of the labor statutes to implement private resolution of disputes in a manner agreed upon would seriously suffer.

*Boys Markets* plainly does not control this case. The District Court found, and it is not now disputed, that the strike was not *over* any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract. The strike at issue was a sympathy strike in support of sister unions negotiating with the employer; neither its causes nor the issue underlying it was subject to the settlement procedures

provided by the contracts between the employer and respondents. The strike had neither the purpose nor the effect of denying or evading an obligation to arbitrate or of depriving the employer of its bargain. Thus, had the contract not contained a no-strike clause or had the clause expressly excluded sympathy strikes, there would have been no possible basis for implying from the existence of an arbitration clause a promise not to strike that could have been violated by the sympathy strike in this case. *Gateway Coal Co.* v. *Mine Workers, supra,* at 382.[10]

---

[10] To the extent that the Court of Appeals, 517 F. 2d, at 1211, and other courts, *Island Creek Coal Co.* v. *Mine Workers,* 507 F. 2d, at 653–654; *Armco Steel Corp.* v. *Mine Workers,* 505 F. 2d, at 1132–1133; *Amstar Corp.* v. *Meat Cutters,* 337 F. Supp. 810, 815 (ED La.), rev'd on other grounds, 468 F. 2d 1372 (CA5 1972); *Inland Steel Co.* v. *Mine Workers,* 505 F. 2d, at 299–300, have assumed that a mandatory arbitration clause implies a commitment not to engage in sympathy strikes, they are wrong.

*Gateway Coal Co.* v. *Mine Workers* itself furnishes no additional support for the employer here. In that case, after finally concluding that the dispute over which the strike occurred was arbitrable within the meaning of the arbitration clause contained in a contract which did not also contain a no-strike clause, the Court held that the contract implied an undertaking not to strike, based on *Teamsters* v. *Lucas Flour Co.,* 369 U. S. 95 (1962), and permitted an injunction against the strike based on the principles of *Boys Markets.* The critical determination in *Gateway* was that the dispute was arbitrable. This was the fulcrum for finding a duty not to strike over that dispute and for enjoining the strike the union had called. Of course, the authority to enjoin the work stoppage depended on "whether the union was under a contractual duty not to strike." 414 U. S., at 380. But that statement was made only preparatory to finding an implied duty not to strike. The strike was then enjoined only because it was over an arbitrable dispute. The same precondition to a strike injunction also existed in *Boys Markets.* Absent that factor, neither case furnishes the authority to enjoin a strike solely

Nor was the injunction authorized solely because it was alleged that the sympathy strike called by the Union violated the express no-strike provision of the contracts. Section 301 of the Act assigns a major role to the courts in enforcing collective-bargaining agreements, but aside from the enforcement of the arbitration provisions of such contracts, within the limits permitted by *Boys Markets,* the Court has never indicated that the courts may enjoin actual or threatened contract violations despite the Norris-LaGuardia Act. In the course of enacting the Taft-Hartley Act, Congress rejected the proposal that the Norris-LaGuardia Act's prohibition against labor-dispute injunctions be lifted to the extent necessary to make injunctive remedies available in federal courts for the purpose of enforcing collective-bargaining agreements. See *Sinclair Refining Co.* v. *Atkinson, supra,* at 205–208, and 216–224 (dissenting opinion). The allegation of the complaint that the Union was breaching its obligation not to strike did not in itself warrant an injunction. As was stated in the *Sinclair* dissent embraced in *Boys Markets:*

> "[T]here is no general federal anti-strike policy; and although a suit may be brought under § 301 against strikes which, while they are breaches of private contracts, do not threaten any additional public policy, in such cases the anti-injunction policy of Norris-LaGuardia should prevail." 370 U. S., at 225.

The contracts here at issue, however, also contained grievance and arbitration provisions for settling disputes over the interpretation and application of the provisions of the contracts, including the no-strike clause. That

because it is claimed to be in breach of contract and because this claim is itself arbitrable.

clause, like others, was subject to enforcement in accordance with the procedures set out in the contracts. Here the Union struck, and the parties were in dispute whether the sympathy strike violated the Union's no-strike undertaking. Concededly, that issue was arbitrable. It was for the arbitrator to determine whether there was a breach, as well as the remedy for any breach, and the employer was entitled to an order requiring the Union to arbitrate if it refused to do so. But the Union does not deny its duty to arbitrate; in fact, it denies that the employer ever demanded arbitration. However that may be, it does not follow that the District Court was empowered not only to order arbitration but to enjoin the strike pending the decision of the arbitrator, despite the express prohibition of § 4 (a) of the Norris-LaGuardia Act against injunctions prohibiting any person from "[c]easing or refusing to perform any work or to remain in any relation of employment." If an injunction could issue against the strike in this case, so in proper circumstances could a court enjoin any other alleged breach of contract pending the exhaustion of the applicable grievance and arbitration provisions even though the injunction would otherwise violate one of the express prohibitions of § 4. The court in such cases would be permitted, if the dispute was arbitrable, to hold hearings, make findings of fact,[11] interpret the applicable provisions of the contract and issue injunctions so as to restore the status quo, or to otherwise regulate the relationship of the parties pending exhaustion of the arbitration process. This would cut deeply into the policy of the Norris-LaGuardia Act and make the courts potential participants in a wide range of arbitrable disputes under the many existing and future collective-

---

[11] See Fed. Rule Civ. Proc. 52 (a).

bargaining contracts,[12] not just for the purpose of enforcing promises to arbitrate, which was the limit of *Boys Markets,* but for the purpose of preliminarily dealing with the merits of the factual and legal issues that are subjects for the arbitrator and of issuing injunctions that would otherwise be forbidden by the Norris-LaGuardia Act.

This is not what the parties have bargained for. Surely it cannot be concluded here, as it was in *Boys Markets,* that such injunctions pending arbitration are essential to carry out promises to arbitrate and to implement the private arrangements for the administration of the contract. As is typical, the agreements in this case outline the prearbitration settlement procedures and provide that if the grievance "has not been . . . satisfactorily adjusted," arbitration may be had. Nowhere do they provide for coercive action of any kind, let alone judicial injunctions, short of the terminal decision of the arbitrator. The parties have agreed to submit to grievance procedures and arbitrate, not to litigate. They have not contracted for a judicial preview of the facts and the law.[13] Had they anticipated additional regulation of their relationships pending arbitration, it seems very doubtful that they would have resorted to litigation rather than to private arrangements. The unmistakable policy of Congress stated in § 203 (d), 29 U. S. C. § 173 (d), is: "Final adjustment by a method agreed

---

[12] This could embroil the district courts in massive preliminary injunction litigation. In 1972, the most recent year for which comprehensive data have been published, more than 21 million workers in the United States were covered under more than 150,000 collective-bargaining agreements. Bureau of Labor Statistics, Directory of National Unions and Employee Associations 87–88 (1973).

[13] Whether a district court's preview led it to grant or to refuse the requested injunction pending arbitration, its order, as in this case, would be appealable, 28 U. S. C. § 1292 (a)(1).

upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." *Gateway Coal Co. v. Mine Workers,* 414 U. S., at 377. But the parties' agreement to adjust or to arbitrate their differences themselves would be eviscerated if the courts for all practical purposes were to try and decide contractual disputes at the preliminary injunction stage.

The dissent suggests that injunctions should be authorized in cases such as this at least where the violation, in the court's view, is clear and the court is sufficiently sure that the parties seeking the injunction will win before the arbitrator. But this would still involve hearings, findings, and judicial interpretations of collective-bargaining contracts. It is incredible to believe that the courts would always view the facts and the contract as the arbitrator would; and it is difficult to believe that the arbitrator would not be heavily influenced or wholly pre-empted by judicial views of the facts and the meaning of contracts if this procedure is to be permitted. Injunctions against strikes, even temporary injunctions, very often permanently settle the issue; and in other contexts time and expense would be discouraging factors to the losing party in court in considering whether to relitigate the issue before the arbitrator.

With these considerations in mind, we are far from concluding that the arbitration process will be frustrated unless the courts have the power to issue interlocutory injunctions pending arbitration in cases such as this or in others in which an arbitrable dispute awaits decision. We agree with the Court of Appeals that there is no necessity here, such as was found to be the case in *Boys Markets,* to accommodate the policies of the Norris-LaGuardia Act to the requirements of § 301 by empowering

the District Court to issue the injunction sought by the employer.

The judgment of the Court of Appeals is affirmed.

*So ordered.*

Mr. Justice Stevens, with whom Mr. Justice Brennan, Mr. Justice Marshall, and Mr. Justice Powell join, dissenting.

A contractual undertaking not to strike is the union's normal *quid pro quo* for the employer's undertaking to submit grievances to binding arbitration. The question in this case is whether that *quid pro quo* is severable into two parts—one which a federal court may enforce by injunction and another which it may not.

Less than three years ago all eight of my Brethren joined in an opinion which answered that question quite directly by stating that whether a district court has authority to enjoin a work stoppage "depends on whether the union was under a contractual duty not to strike." *Gateway Coal Co.* v. *Mine Workers,* 414 U. S. 368, 380.[1]

The Court today holds that only a part of the union's *quid pro quo* is enforceable by injunction.[2] The prin-

---

[1] The Court read *Boys Markets* v. *Retail Clerks Union,* 398 U. S. 235, to conclude that "§ 301 (a) empowers a federal court to enjoin violations of a contractual duty not to strike." 414 U. S., at 381. There was no dissent from that proposition.

[2] The enforceable part of the no-strike agreement is the part relating to a strike "over an arbitrable dispute." In *Gateway Coal,* however, my Brethren held that the District Court had properly entered an injunction that not only terminated a strike pending an arbitrator's decision of an underlying safety dispute, but also "prospectively required both parties to abide by his resolution of the controversy." *Id.,* at 373. A strike in defiance of an arbitrator's award would not be "over an arbitrable dispute"; nevertheless, the Court today recognizes the propriety of an injunction against such a strike. *Ante,* at 405.

cipal bases for the holding are (1) the Court's literal interpretation of the Norris-LaGuardia Act; and (2) its fear that the federal judiciary would otherwise make a "massive" entry into the business of contract interpretation heretofore reserved for arbitrators. The first argument has been rejected repeatedly in cases in which the central concerns of the Norris-LaGuardia Act were not implicated. The second is wholly unrealistic[3] and was implicitly rejected in *Gateway Coal* when the Court held that "a substantial question of contractual interpretation" was a sufficient basis for federal equity jurisdiction. 414 U. S., at 384. That case held that an employer might enforce a somewhat ambiguous *quid pro quo;* today the Court holds that a portion of the *quid pro quo* is unenforceable no matter how unambiguous it may be. With all respect, I am persuaded that a correct application of the reasoning underlying the landmark decision in *Boys Markets* v. *Retail Clerks Union,* 398 U. S. 235, requires a different result.

In order to explain my conclusion adequately, I first review the rationale of *Boys Markets* and then relate that rationale to the question presented by this case.

---

[3] The Court's expressed concern that enforcing an unambiguous no-strike clause by enjoining a sympathy strike might "embroil the district courts in massive preliminary injunction litigation," *ante,* at 411 n. 12, is supposedly supported by the fact that 21 million American workers were covered by over 150,000 collective-bargaining agreements in 1972. These figures give some idea of the potential number of grievances that may arise, each of which could lead to a strike which is plainly enjoinable under *Boys Markets.* These figures do not shed any light on the number of sympathy strikes which may violate an express no-strike commitment. In the past several years over a dozen such cases have arisen. See *ante,* at 404 n. 9. Future litigation of this character would, of course, be minimized by clarifying amendments to existing no-strike clauses.

# I

Eight years before *Boys Markets,* the Court squarely held that the Norris-LaGuardia Act precluded a federal district court from enjoining a strike in breach of a no-strike obligation under a collective-bargaining agreement requiring arbitration of the underlying dispute. *Sinclair Refining Co.* v. *Atkinson,* 370 U. S. 195.[4] To authorize the injunction in *Boys Markets,* the Court was therefore required to overrule a decision directly in point as well as to harmonize its holding with the language of the Norris-LaGuardia Act. The Court found several reasons that compelled this result.

First, the Court noted that injunctions enforcing a contractual commitment to arbitrate a grievance were not among the abuses against which the Norris-LaGuardia Act was aimed.[5] This, of course, is clear from the declaration of policy in the Norris-LaGuardia Act itself,[6]

---

[4] One week after the decision in *Sinclair,* the Court decided *Teamsters* v. *Yellow Transit,* 370 U. S. 711, by *per curiam* order citing only *Sinclair.* The dissenters in *Sinclair,* whose position was substantially adopted in *Boys Markets,* concurred in *Yellow Transit* because "the collective bargaining agreement involved in this case does not bind either party to arbitrate any dispute." 370 U. S., at 711–712. In this case, as in those cases, it does not follow from the availability of an injunction when the agreement contains a mandatory arbitration clause that one may issue when it does not. See n. 20, *infra.*

[5] Referring to the holding in *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448, the Court stated that it had "rejected the contention that the anti-injunction proscriptions of the Norris-La-Guardia Act prohibited this type of relief, noting that a refusal to arbitrate was not 'part and parcel of the abuses against which the Act was aimed,' *id.,* at 458, and that the Act itself manifests a policy determination that arbitration should be encouraged. See 29 U. S. C. § 108." 398 U. S., at 242 (footnote omitted).

[6] Section 2 of the Act provides:

"In the interpretation of this Act and in determining the jurisdiction and authority of the courts of the United States, as such

416

which plainly identifies a primary concern with protecting labor's ability to organize and to bargain collectively. It was the history of injunctions against strike activity in furtherance of union organization, recognition, and collective bargaining, rather than judicial enforcement of collective-bargaining agreements, that led to the enactment of the Norris-LaGuardia Act in 1932.[7] As the

jurisdiction and authority are herein defined and limited, the public policy of the United States is hereby declared as follows:

"Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the United States are hereby enacted." 47 Stat. 70, 29 U. S. C. § 102.

[7] In *Boys Markets* the Court quoted with approval the following statement by the neutral members of the Special *Atkinson-Sinclair* Committee of the American Bar Association Labor Relations Law Section:

"'Any proposal which would subject unions to injunctive relief must take account of the Norris-LaGuardia Act and the opposition expressed in that Act to the issuing of injunctions in labor disputes. Nevertheless, the reasons behind the Norris-LaGuardia Act seem scarcely applicable to the situation . . . [in which a strike in violation of a collective-bargaining agreement is enjoined]. The Act was passed primarily because of widespread dissatisfaction with the tendency of judges to enjoin concerted activities in accordance with "doctrines of tort law which made the lawfulness of a strike depend upon judicial views of social and economic policy." [Citation

Court observed in *Boys Markets,* the climate of labor relations has been transformed since the passage of the Norris-LaGuardia Act, 398 U. S., at 250–251, and "the central purpose of the Norris-LaGuardia Act to foster the growth and viability of labor organizations is hardly retarded—if anything, this goal is advanced—by a remedial device that merely enforces the obligation that the union freely undertook under a specifically enforceable agreement to submit disputes to arbitration." *Id.,* at 252–253 (footnote omitted). It is equally clear that the present case does not implicate the central concerns of the Norris-LaGuardia Act; for it also deals with the enforceability of a collective-bargaining agreement rather than with the process by which such agreements are negotiated and formed.

Second, the Court emphasized the relevance of the subsequently enacted statute enlarging the jurisdiction of federal courts to grant relief in labor disputes. Section 301 (a) of the Labor Management Relations Act expressly authorized federal jurisdiction of suits for violation of collective-bargaining agreements without respect to the amount in controversy or the citizenship of the parties. That provision was viewed as supporting the collective-bargaining process, for employers would have more incentive to enter into agreements with un-

---

omitted.] Where an injunction is used against a strike in breach of contract, the union is not subjected in this fashion to judicially created limitations on its freedom of action but is simply compelled to comply with limitations to which it has previously agreed. Moreover, where the underlying dispute is arbitrable, the union is not deprived of any practicable means of pressing its claim but is only required to submit the dispute to the impartial tribunal that it has agreed to establish for this purpose.'" 398 U. S., at 253 n. 22, quoting Report of Special *Atkinson-Sinclair* Committee, American Bar Association Labor Relations Law Section—Proceedings 242 (1963).

ions if they were mutually enforceable than if they were not. With specific reference to the value of an enforceable commitment to arbitrate grievance disputes, *Boys Markets* emphasized the importance of the union's no-strike commitment as the *quid pro quo* for the employer's undertaking to submit disputes to arbitration.[8] And in many collective-bargaining agreements, the em-

[8] "As we have previously indicated, a no-strike obligation, express or implied, is the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration. See *Textile Workers Union* v. *Lincoln Mills, supra,* at 455. Any incentive for employers to enter into such an arrangement is necessarily dissipated if the principal and most expeditious method by which the no-strike obligation can be enforced is eliminated. While it is of course true, as respondent contends, that other avenues of redress, such as an action for damages, would remain open to an aggrieved employer, an award of damages after a dispute has been settled is no substitute for an immediate halt to an illegal strike. Furthermore, an action for damages prosecuted during or after a labor dispute would only tend to aggravate industrial strife and delay an early resolution of the difficulties between employer and union." 398 U. S., at 247–248 (footnotes omitted). Accord, *William E. Arnold Co.* v. *Carpenters,* 417 U. S. 12, 19; *Gateway Coal,* 414 U. S., at 381–382, and n. 14.

The Court relied upon another statement by the neutral members of the Special *Atkinson-Sinclair* Committee:

" 'Under existing laws, employers may maintain an action for damages resulting from a strike in breach of contract and may discipline the employees involved. In many cases, however, neither of these alternatives will be feasible. Discharge of the strikers is often inexpedient because of a lack of qualified replacements or because of the adverse effect on relationships within the plant. The damage remedy may also be unsatisfactory because the employer's losses are often hard to calculate and because the employer may hesitate to exacerbate relations with the union by bringing a damage action. Hence, injunctive relief will often be the only effective means by which to remedy the breach of the no-strike pledge and thus effectuate federal labor policy.' " 398 U. S., at 248–249, n. 17, quoting Report of Special *Atkinson-Sinclair* Committee, *supra,* n. 7, at 242.

ployer has agreed to mandatory arbitration only in exchange for a no-strike clause that extends beyond strikes over arbitrable disputes.[9] It is therefore simply wrong to argue, as the Court does, that the strike in this case could not have had the purpose or effect "of depriving the employer of his bargain." *Ante,* at 408. If the sympathy strike in this case violates the Union's no-strike pledge, the same public interest in an enforceable *quid pro quo* is present here as in *Boys Markets.* The Union contends, however, that this strike did not violate its contract, or at least, that it has not yet been decided that it does. Accordingly, this portion of the rationale of *Boys Markets* applies only to the extent of the certainty that the sympathy strike falls within the no-strike clause.

Third, the Court relied upon a line of cases in which the language of the Norris-LaGuardia Act had not been given controlling effect. Several decisions had held that the federal courts could issue injunctions in labor disputes to compel employers and unions to fulfill their obligations under the Railway Labor Act,[10] notwithstanding "the earlier and more general provisions of the Norris-LaGuardia Act." *Virginian R. Co.* v. *System Federation,* 300 U. S. 515, 563. Accord, *Railroad Trainmen* v. *Howard,* 343 U. S. 768, 774; *Graham* v. *Locomotive Firemen,* 338 U. S. 232, 237–240. These decisions culminated in *Railroad Trainmen* v. *Chicago, R. & I. R. Co.,* 353 U. S. 30, 39–42, which held that a federal court could enjoin a strike by a railroad union over a dispute subject to mandatory arbitration under the Railway Labor Act. The Norris-LaGuardia Act was held not to bar the injunction because of "the need to accommodate

---

[9] Feller, A General Theory of the Collective Bargaining Agreement, 61 Calif. L. Rev. 663, 757–760 (1973).

[10] 44 Stat. 577, as amended, 48 Stat. 1185, 45 U. S. C. §§ 151–188.

two statutes, when both were adopted as a part of a pattern of labor legislation." *Id.,* at 42. See *Chicago & N. W. R. Co.* v. *Transportation Union,* 402 U. S. 570, 581–584. In *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448, the Court relied on the same rationale to hold that § 301 (a) of the Labor Management Relations Act conferred jurisdiction upon the district courts to grant the union specific enforcement of an arbitration clause in a collective-bargaining agreement. Speaking for the Court, Mr. Justice Douglas noted that the legislative history of § 301 (a) "is somewhat cloudy and confusing" but that the conference report had stated that once the parties had made a collective-bargaining agreement, its enforcement " 'should be left to the usual processes of the law.' " 353 U. S., at 452, quoting H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 42 (1947). He added:

> "Both the Senate and the House took pains to provide for 'the usual processes of the law' by provisions which were the substantial equivalent of § 301 (a) in its present form. Both the Senate Report and the House Report indicate a primary concern that unions as well as employees should be bound to collective bargaining contracts. But there was also a broader concern—a concern with a procedure for making such agreements enforceable in the courts by either party. At one point the Senate Report, [S. Rep. No. 105, 80th Cong., 1st Sess. (1947),] p. 15, states, 'We feel that the aggrieved party should also have a right of action in the Federal courts. Such a policy is completely in accord with the purpose of the Wagner Act which the Supreme Court declared was "to compel employers to bargain collectively with their employees to the end that an employment contract, binding on both parties, should be made . . . ." '

"Congress was also interested in promoting collective bargaining that ended with agreements not to strike.  The Senate Report, *supra,* p. 16 states:

" 'If unions can break agreements with relative impunity, then such agreements do not tend to stabilize industrial relations.  The execution of an agreement does not by itself promote industrial peace.  The chief advantage which an employer can reasonably expect from a collective labor agreement is assurance of uninterrupted operation during the term of the agreement.  Without some effective method of assuring freedom from economic warfare for the term of the agreement, there is little reason why an employer would desire to sign such a contract.

" 'Consequently, to encourage the making of agreements and to promote industrial peace through faithful performance by the parties, collective agreements affecting interstate commerce should be enforceable in the Federal courts.  Our amendment would provide for suits by unions as legal entities and against unions as legal entities in the Federal courts in disputes affecting commerce.'

"Thus collective bargaining contracts were made 'equally binding and enforceable on both parties.' *Id.,* p. 15.  As stated in the House Report, [H. R. Rep. No. 245, 80th Cong., 1st Sess. (1947),] p. 6, the new provision 'makes labor organizations equally responsible with employers for contract violations and provides for suit by either against the other in the United States district courts.'  To repeat, the Senate Report, *supra,* p. 17, summed up the philosophy of § 301 as follows: 'Statutory recognition of the collective agreement as a valid, binding, and enforceable contract is a logical and necessary step.

It will promote a higher degree of responsibility upon the parties to such agreements, and will thereby promote industrial peace.'

"Plainly the agreement to arbitrate grievance disputes is the *quid pro quo* for an agreement not to strike. Viewed in this light, the legislation does more than confer jurisdiction in the federal courts over labor organizations. It expresses a federal policy that federal courts should enforce these agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way." 353 U. S., at 453–455 (footnote omitted).

With direct reference to the argument that jurisdiction was withdrawn by the Norris-LaGuardia Act, Mr. Justice Douglas pointed out that even though a literal reading of that statute might bring the dispute within its terms, there was no policy justification for restricting § 301 (a) to damages suits and subjecting specific performance of an agreement to arbitrate grievance disputes to the inapposite provisions of that Act. 353 U. S., at 458.

These decisions and the holding of *Boys Markets* itself, make clear that the literal wording of the Norris-LaGuardia Act is not an insuperable obstacle to specific enforcement of a no-strike commitment in accordance with "the usual processes of the law." [11]

[11] The Court relies upon the fact that when Congress enacted the Labor Management Relations Act, it considered and rejected a proposal that would have rendered the Norris-LaGuardia Act inapplicable in any proceeding involving the violation of a collective-bargaining agreement. *Ante,* at 409. The argument that congressional rejection of a broad repeal of the Norris-LaGuardia Act precluded accommodation of the two Acts was fully canvassed in *Sinclair,* where it was accepted by the Court and rejected by the dissenters, whose views were later substantially adopted by the Court

Fourth, *Boys Markets* stressed one anomalous conse-
quence of *Sinclair*. In many state jurisdictions a no-
strike clause could be enforced by injunction. The
enactment of § 301 (a), which was intended to provide
an additional forum for the enforcement of collective-
bargaining agreements,[12] made it possible to remove
state litigation to the federal forum,[13] and then to fore-
close any injunctive relief by reliance on the Norris-
LaGuardia Act. 398 U. S., at 243–247. This incon-
gruous result could not easily be squared with the intent
of Congress in § 301 (a) to confer concurrent jurisdiction
upon the state courts. That argument applies with
equal force to this case.

Finally, *Boys Markets* emphasized the strong federal
policy favoring settlement of labor disputes by arbitra-
tion. 398 U. S., at 242–243. Since, apart from statu-
tory authorization, this method of settling disputes is
available only when authorized by agreement between
the parties, the policy favoring arbitration equally favors
the making of enforceable agreements to arbitrate. For
that reason, *Boys Markets* also emphasized the impor-
tance of ensuring enforceability of the union's *quid pro
quo* for the employer's agreement to submit grievance
disputes to arbitration. *Id.*, at 247–249, 251–253. A
sympathy strike in violation of a no-strike clause does

---

in *Boys Markets. Sinclair Refining Co.* v. *Atkinson,* 370 U. S. 195,
204–210; *id.*, at 220–225 (BRENNAN, J., dissenting); *Boys Markets,*
398 U. S., at 249. The Court today nevertheless revives this
argument, candidly citing the overruled decision in *Sinclair,* and
arguing, as did the opinion in that case, that any further ac-
commodation between the Labor Management Relations Act and
the Norris-LaGuardia Act will result in wholesale enforcement of
no-strike clauses by injunction. See *Sinclair, supra,* at 209–210.

[12] *William E. Arnold Co.* v. *Carpenters,* 417 U. S., at 20; *Dowd
Box Co.* v. *Courtney,* 368 U. S. 502.

[13] *Avco Corp.* v. *Aero Lodge 735,* 390 U. S. 557.

not directly frustrate the arbitration process, but if the clause is not enforceable against such a strike, it does frustrate the more basic policy of motivating employers to agree to binding arbitration by giving them an effective "assurance of uninterrupted operation during the term of the agreement." [14] This portion of *Boys Markets* is therefore not entirely applicable to the present case. Accordingly, it is essential to consider the importance of arbitration to the holding in *Boys Markets*. To that question I now turn.

## II

The *Boys Markets* decision protects the arbitration process. A court is authorized to enjoin a strike over a grievance which the parties are contractually bound to arbitrate, but that authority is conditioned upon a finding that the contract does so provide, that the strike is in violation of the agreement, and further that the issuance of an injunction is warranted by ordinary principles of equity. *Id.*, at 254.[15] These conditions plainly stated in *Boys Markets* demonstrate that the interest in protecting the arbitration process is not simply an end in

---

[14] *Lincoln Mills*, 353 U. S., at 454. As the Court reminded us in *Gateway Coal*, " 'the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs.' " 414 U. S., at 379, quoting *Steelworkers* v. *Warrior & Gulf Co.*, 363 U. S. 574, 582.

[15] *Gateway Coal* later extended *Boys Markets* to an injunction enforcing an implied no-strike clause coextensive with the arbitration clause in a case in which the question of arbitrability was itself a "substantial question of contractual interpretation." 414 U. S., at 380–384. It did not alter the fundamental preconditions of a *Boys Markets* injunction: a contractual commitment to final and binding arbitration, a corresponding no-strike commitment, and satisfaction of the ordinary principles of equity. *Id.*, at 380–384, 387–388.

itself which exists at large and apart from other funda-
mental aspects of our national labor policy.

On the one hand, an absolute precondition of any *Boys
Markets* injunction is a contractual obligation. A court
may not order arbitration unless the parties have agreed
to that process; nor can the court require the parties to
accept an arbitrator's decision unless they have agreed
to be bound by it. *Id.,* at 253–255. Accord, *Gateway
Coal,* 414 U. S., at 374, 380–384. If the union reserves
the right to resort to self-help at the conclusion of the
arbitration process, that agreement must be respected.[16]
The court's power is limited by the contours of the agree-
ment between the parties.[17]

On the other hand, the arbitration procedure is not
merely an exercise; it performs the important purpose
of determining what the underlying agreement actually
means as applied to a specific setting. If the parties
have agreed to be bound by the arbitrator's decision, the
reasons which justify an injunction against a strike that
would impair his ability to reach a decision must equally
justify an injunction requiring the parties to abide by a
decision that a strike is in violation of the no-strike
clause.[18] The arbitration mechanism would hardly re-
tain its respect as a method of resolving disputes if the

---

[16] *Associated Gen. Contractors of Illinois* v. *Illinois Conference of
Teamsters,* 454 F. 2d 1324 (CA7 1972).

[17] In particular, an implied no-strike clause does not extend to
sympathy strikes. See *ante,* at 407–408, and n. 10.

[18] The Court recognizes that an injunction may issue to enforce
an arbitrator's decision that a strike is in violation of the no-strike
clause. *Ante,* at 405. See *Longshoremen* v. *Marine Trade Assn.,* 389
U. S. 64, 77–79 (Douglas, J., concurring in part and dissenting
in part); *New Orleans S. S. Assn.* v. *General Longshore Workers,* 389
F. 2d 369 (CA5 1968), cert. denied, 393 U. S. 828; Dunau, Three
Problems in Labor Arbitration, 55 Va. L. Rev. 427, 473–477 (1969).

end product of the process had less significance than the process itself.

The net effect of the arbitration process is to remove completely any ambiguity in the agreement as it applies to an unforeseen, or undescribed, set of facts. But if the specific situation is foreseen and described in the contract itself with such precision that there is no need for interpretation by an arbitrator, it would be reasonable to give the same legal effect to such an agreement prior to the arbitrator's decision.[19] In this case, the question whether the sympathy strike violates the no-strike clause is an arbitrable issue. If the court had the benefit of an arbitrator's resolution of the issue in favor of the employer, it could enforce that decision just as it could require the parties to submit the issue to arbitration. And if the agreement were so plainly unambiguous that there could be no bona fide issue to submit to the arbitrator, there must be the same authority to enforce the parties' bargain pending the arbitrator's final decision.[20]

---

[19] The Court asserts that interim relief should not be granted unless the collective-bargaining agreement expressly provides for it. *Ante,* at 411. The same argument could have been made against the holding in *Boys Markets,* since *Sinclair* left the parties free to endow the arbitrator with power to order an end to strikes over arbitrable grievances. Indeed, the union members of the Special Atkinson-Sinclair Committee suggested such contractual provisions as an alternative to abandonment of *Sinclair.* Report of Special *Atkinson-Sinclair* Committee, *supra,* n. 7, at 239.

[20] Cf. *Stokely-Van Camp, Inc.* v. *Thacker,* 394 F. Supp. 715, 719–720 (WD Wash. 1975); Note, The Applicability of *Boys Markets* Injunctions to Refusals to Cross a Picket Line, 76 Col. L. Rev. 113, 136–140 (1976). It is not necessary to hold that an injunction may issue if the scope of the no-strike clause is not a clearly arbitrable issue. If the agreement contains no arbitration clause whatsoever, enforcement of the no-strike clause would not promote arbitration by encouraging employers to agree to an arbitration clause in exchange for a no-strike clause. Furthermore, even

The Union advances three arguments against this conclusion: (1) that interpretation of the collective-bargaining agreement is the exclusive province of the arbitrator; (2) that an injunction erroneously entered pending arbitration will effectively deprive the union of the right to strike before the arbitrator can render his decision; and (3) that it is the core purpose of the Norris-LaGuardia Act to eliminate the risk of an injunction against a lawful strike.[21] Although I acknowledge the force of these arguments, I think they are insufficient to take this case outside the rationale of *Boys Markets.*

The *Steelworkers* trilogy [22] establishes that a collective-bargaining agreement submitting all questions of contract interpretation to the arbitrator deprives the courts of

---

if the agreement contains an arbitration clause, but the clause does not clearly extend to the question whether a strike violates the agreement, then the parties' commitment to enforcement of the no-strike clause through enforcement of the arbitrator's final decision also remains unclear.

[21] The Union also argues that an injunction should be barred because the party seeking arbitration is usually required to accept the condition of which he complains pending the decision of the arbitrator. The employer normally receives the benefit of this rule, since it is the union that initiates most grievances. The Union contends that fairness dictates that it receive the same benefit pending the outcome of employer grievances. However, the rule has its origins in the need for production to go forward under the employer's control pending clarification of the agreement through arbitration. See Feller, *supra,* n. 9, at 737–740. This justification hardly supports, but rather undermines, the Union's position.

The Court advances the same argument as a threat of "massive preliminary injunction litigation" by both employers and unions over all arbitrable disputes. *Ante,* at 411 n. 12. This argument simply ignores the special status of the no-strike clause as the *quid pro quo* of the arbitration clause.

[22] *Steelworkers* v. *American Mfg. Co.,* 363 U. S. 564, 567–568; *Steelworkers* v. *Warrior & Gulf Co.,* 363 U. S., at 582–583; *Steelworkers* v. *Enterprise Corp.,* 363 U. S. 593, 597–599.

almost all power to interpret the agreement to prevent submission of a dispute to arbitration or to refuse enforcement of an arbitrator's award. *Boys Markets* itself repeated the warning that it was not for the courts to usurp the functions of the arbitrator. 398 U. S., at 242–243. And *Gateway Coal* held that an injunction may issue to protect the arbitration process even if a "substantial question of contractual interpretation" must be answered to determine whether the strike is over an arbitrable grievance. 414 U. S., at 382–384. In each of these cases, however, the choice was between interpretation of the agreement by the court or interpretation by the arbitrator; a decision that the dispute was not arbitrable, or not properly arbitrated, would have precluded an interpretation of the agreement according to the contractual grievance procedure. In the present case, an interim determination of the no-strike question by the court neither usurps nor precludes a decision by the arbitrator. By definition, issuance of an injunction pending the arbitrator's decision does not supplant a decision that he otherwise would have made. Indeed, it is the ineffectiveness of the damages remedy for strikes pending arbitration that lends force to the employer's argument for an injunction.[23] The court does not oust the arbitrator of his proper function but fulfills a role that he never served.

The Union's second point, however, is that the arbitrator will rarely render his decision quickly enough to prevent an erroneously issued injunction from effectively depriving the union of its right to strike. The Union relies particularly upon decisions of this Court that recognize that even a temporary injunction can quickly end a strike.[24] But this argument demonstrates only that

[23] See n. 8, *supra.*
[24] *Construction Laborers* v. *Curry,* 371 U. S. 542, 550; *Liner* v.

arbitration, to be effective, must be prompt, not that the federal courts must be deprived entirely of jurisdiction to grant equitable relief. Denial of an injunction when a strike violates the agreement may have effects just as devastating to an employer as the issuance of an injunction may have to the union when the strike does not violate the agreement. Furthermore, a sympathy strike does not directly further the economic interests of the members of the striking local or contribute to the resolution of any dispute between that local, or its members, and the employer.[25] On the contrary, it is the source of a new dispute which, if the strike goes forward, will impose costs on the strikers, the employer, and the public without prospect of any direct benefit to any of these parties. A rule that authorizes postponement of a sympathy strike pending an arbitrator's clarification of the no-strike clause will not critically impair the vital interests of the striking local even if the right to strike is upheld, and will avoid the costs of interrupted production if the arbitrator concludes that the no-strike clause applies.

---

*Jafco, Inc.*, 375 U. S. 301, 308. *Curry* held that a judgment of a State Supreme Court requiring issuance of a temporary injunction against labor picketing was final and hence reviewable in this Court. *Liner* held that a state-court injunction against labor picketing was reviewable in this Court despite a claim of mootness arising from completion of construction at the picketed site. In both cases, the claim on the merits was that state-court jurisdiction was pre-empted by federal law. The finality and mootness holdings in each case rested partly on the need to protect federal labor policy from frustration by temporary injunctions erroneously issued by state courts. It was at this point that the final effect of a temporary labor injunction became relevant.

[25] In this case the sympathy strike is in support of a strike by other local unions of the same international. The parties, however, attach no significance to that fact.

Finally, the Norris-LaGuardia Act cannot be interpreted to immunize the union from all risk of an erroneously issued injunction. *Boys Markets* itself subjected the union to the risk of an injunction entered upon a judge's erroneous conclusion that the dispute was arbitrable and that the strike was in violation of the no-strike clause, 398 U. S., at 254. *Gateway Coal* subjected the union to a still greater risk, for the court there entered an injunction to enforce an implied no-strike clause despite the fact that the arbitrability of the dispute, and hence the legality of the strike over the dispute, presented a "substantial question of contractual interpretation." 414 U. S., at 384; see *id.*, at 380 n. 10. The strict reading that the Union would give the Norris-LaGuardia Act would not have permitted this result.[26]

---

[26] The Court emphasizes the risk of conflicting determinations in this case, but ignores the risk of conflicting determinations in *Boys Markets* and *Gateway Coal*. In *Boys Markets*, the District Court was required to determine the arbitrability of the dispute and the legality of the strike, clear or not, and in *Gateway Coal*, the District Court need only have found that the arbitrability of the dispute and the legality of the strike were "a substantial question of contractual interpretation," and hence not clear at all. The likelihood of an injunction against a lawful strike was vastly larger under the standard of *Gateway Coal* than under a standard requiring the District Court to find a clear violation of the no-strike clause.

The Court obscures the latter point by misreading *Gateway Coal* to hold that an injunction was properly issued because the dispute in that case was arbitrable. *Ante,* at 408–409, n. 10. But *Gateway Coal* expressly held that the question whether the union properly invoked a provision for work stoppages because of unsafe mine conditions was "a substantial question of contractual interpretation, and the collective-bargaining agreement explicitly commits to resolution by an impartial umpire all disagreements 'as to the meaning and application of the provisions of this agreement.'" 414 U. S., at 384 (footnote omitted). Consistently with this holding, the arbitrator remained free to decide that the underlying dispute was not arbitra-

These considerations, however, do not support the conclusion that a sympathy strike should be temporarily enjoined whenever a collective-bargaining agreement contains a no-strike clause and an arbitration clause. The accommodation between the Norris-LaGuardia Act and § 301 (a) of the Labor Management Relations Act allows the judge to apply "the usual processes of the law" but not to take the place of the arbitrator. Because of the risk that a federal judge, less expert in labor matters than an arbitrator, may misconstrue general contract language, I would agree that no injunction or temporary restraining order should issue without first giving the union an adequate opportunity to present evidence and argument, particularly upon the proper interpretation of the collective-bargaining agreement; the judge should not issue an injunction without convincing evidence that the strike is clearly within the no-strike clause.[27] Furthermore, to protect the efficacy of arbitration, any such injunction should require the parties to submit the issue immediately to the contractual grievance procedure, and if the union so requests, at the last stage and upon an expedited schedule that assures a decision by the arbitrator as soon as practicable. Such stringent conditions would insure that only strikes in violation of the agreement would be enjoined and that the union's access to the arbitration process would not be foreclosed by the combined effect of a temporary injunction and protracted grievance procedures. Finally, as in *Boys*

ble and hence that the enjoined strike was not in violation of the agreement.

[27] Of course, it is possible that an arbitrator would disagree with the court even when the latter finds the strike to be clearly prohibited. But in that case, the arbitrator's determination would govern, provided it withstands the ordinary standard of review for arbitrators' awards. See *Steelworkers* v. *Enterprise Corp.*, 363 U. S., at 597–599.

*Markets,* the normal conditions of equitable relief would have to be met.[28]

Like the decision in *Boys Markets,* this opinion reflects, on the one hand, my confidence that experience during the decades since the Norris-LaGuardia Act was passed has dissipated any legitimate concern about the impartiality of federal judges in disputes between labor and management, and on the other, my continued recognition of the fact that judges have less familiarity and expertise than arbitrators and administrators who regularly work in this specialized area. The decision in *Boys Markets* requires an accommodation between the Norris-LaGuardia Act and the Labor Management Relations Act. I would hold only that the terms of that accommodation do not entirely deprive the federal courts of all power to grant any relief to an employer, threatened with irreparable injury from a sympathy strike clearly in violation of a collective-bargaining agreement, regardless of the equities of his claim for injunctive relief pending arbitration.

Since in my view the Court of Appeals erroneously held that the District Court had no jurisdiction to enjoin the Union's sympathy strike, I would reverse and remand for consideration of the question whether the employer is entitled to an injunction.

---

[28] " '[T]he District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.' " 398 U. S., at 254, quoting *Sinclair,* 370 U. S., at 228 (BRENNAN, J., dissenting).