EATON CORPORATION, INDUSTRIAL DRIVES OPERATIONS, RICHMOND DIVISION, Plaintiff-Appellee,

v.

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS et al., Defendants-Appellants.

No. 77–2026.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1978.

Decided July 26, 1978.

Rehearing and Rehearing En Banc Denied Aug. 31, 1978.

William Julian, II, Indianapolis, Ind., for defendants-appellants.

Herbert C. Snyder, Jr., Indianapolis, Ind., for plaintiff-appellee.

Before PELL and WOOD, Circuit Judges, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

This action was commenced on August 11, 1977, when Appellee Eaton Corporation filed its Complaint in the court below against the appellants, International Association of Machinists and Aerospace Workers (Union). The Complaint alleged the breach of a labor agreement under Section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185 and 28 U.S.C. § 1337, and sought damages for the breach of the Collective Bargaining Agreement (Agreement) which binds all of the parties to this action. Eaton then filed an Amended Complaint seeking, in addition to damages, an injunction prohibiting the Union from any strike, work stoppage, picketing, or the encouragement of any such activity, in violation of the terms of the Agreement. Eaton further sought in its Amended Complaint an order that the Company and the Union comply with the grievance and arbitration procedure of the Agreement. The Union filed its responsive pleading on August 22, 1977.

The District Court, after hearing witnesses for both the Company and the Union and the oral argument of counsel, found that the parties were contractually bound to arbitrate the issues in dispute and that all of the prerequisites for injunctive relief in a labor case had been satisfied, and entered a preliminary injunction ordering a cessation of the strike and work stoppage and ordering the parties to arbitrate their disputes. It is from this order that the Union now appeals.

The Eaton Corporation is a facility employing approximately 185 persons located in Richmond, Indiana. The employees have been represented by the International Association of Machinists and Aerospace Workers, Local 2143, for over twenty years. On April 1, 1977, the parties entered into a three-year Collective Bargaining Agreement making provisions against any strike or other cessation of operations. The major issue in the negotiations leading to this Agreement was Eaton's desire to improve its competitive position, by imposing a "productivity increase" for employees paid on a piece work, or incentive basis. That productivity increase had the effect of a substantial wage cut. The Union agreed that Eaton would be allowed to increase productivity up to fifteen per cent, although many of the details of this productivity improvement plan were unfortunately left for further development by the parties over the life of the Agreement.

---

* Senior District Judge Robert A. Grant of the United States District Court for the Northern District of Indiana is sitting by designation.

After the Agreement went into effect, Eaton moved to implement the terms of the Agreement by reducing the incentive rates by the full fifteen per cent. Union President Charles Koch testified at the hearings before the District Court that the Union was taken by surprise by Eaton's unilateral imposition of a maximum productivity increase on all jobs. Nevertheless, the productivity increase was subjected to the grievance procedures established by the Agreement. Formal grievance meetings were held, at which time the Union requested all the information in Eaton's possession supporting the imposition of the maximum fifteen per cent increase. Eaton agreed to provide information that it felt was relevant to the issues in question but refused to produce any documents they claimed to be extraneous to the grievances then being prosecuted by the Union.

On August 3, 1977, Union President Charles Koch was given a three-day layoff for protesting a piece work disallowance for time spent on machine maintenance. Eaton took the position that Koch's protest represented insubordination and resorting to self-help as opposed to use of the normal grievance procedures of the Agreement. In any event, the suspension served to intensify the growing dispute between Eaton and the Union.

A third step grievance meeting was held on August 4, 1977. At this meeting, the Union requested an opportunity to discuss the layoff of Mr. Koch. The Union also requested an opportunity to discuss Eaton's continuing refusal to furnish it with information necessary to the processing of grievances, including those grievances on the fifteen per cent wage cut. Eaton, in re-liance upon an agenda supplied for the meeting by the Union, agreed only to discuss Mr. Koch's layoff once a written grievance had been filed, and once again took the position that it would only make available relevant information in relation to the fifteen per cent wage cut. After a heated discussion on the issue of the production of documents, the Union asked for a recess and eventually decided that it would take these matters to the National Labor Relations Board.

Later that same day, Eaton's employees walked off the job. On August 16, 1977, the International Association of Machinists and Aerospace Workers officially sanctioned the strike by the membership of the Local. Prior to this, on August 5, 1977, the Union filed charges with the National Labor Relations Board on Eaton's refusal to bargain in good faith over the fifteen per cent wage cut. These charges were pending at the time the labor injunction was issued. Eaton and the Union did not meet or discuss the issues underlying the strike during the period from August 5 through August 23, 1977, the first day of hearings on the preliminary injunction before the District Court. Eaton and the Union also failed to discuss the disputes underlying the strike during a two-day recess between the hearings of August 24 and 25, 1977. The basis for this failure to negotiate was the prevailing unwillingness among the parties to meet and confer during the pendency of the strike.

The Union took the position before the District Court that the strike was a lawful, peaceful, economic strike. Eaton, relying on the provisions of Sections 27 and 28 of the Collective Bargaining Agreement[1] en-

---

1. Sections 27 and 28 of the Collective Bargaining Agreement provide:

    *Section 27.* Any employee or the Union shall have the right to have grievance settled in the following manner and order:

    Step I—Between the aggrieved employee and his steward on the one hand and his department foreman. If a settlement is not reached the grievance shall be reduced to writing in duplicate on forms furnished by the Company then presented to the foreman. The foreman will give his written answer within two full working days and return the original copy to the steward.

    Step II—If a settlement is not reached at Step I the grievance may be appealed to the superintendent or his delegated representative. The superintendent will discuss and give his written answer to the appropriate committeeman. The committeeman may request the presence of the steward in the discussion at this step. The superintendent

tered into by the Company, and the Union, maintained that the contract compels the Union to arbitrate the underlying issues and prohibits the Union from undertaking economic action. The District Court determined that the issues in question were subject to binding arbitration, that an effective no-strike provision was contained in the Agreement, and that all the prerequisites for injunctive relief had been met. Accordingly, the District Court ordered arbitration and required the Union to go back to work on August 29, 1977.

We are here faced with a labor dispute involving a detailed and sometimes confusing factual background. Fortunately, however, the rules of law to be applied in this area are for the most part well established. The pivotal question to this appeal is whether the District Court, based upon the exception first created by *Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), properly granted the preliminary injunction requested by Eaton. The Union takes the position that the anti-injunction provisions of Section 4 of the Norris-La-Guardia Act barred the issuance of an injunc-

tion by the District Court and that the *Boys Markets* exception is not applicable to the present case.

Section 4 of the Norris-LaGuardia Act provides:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment . . ..

29 U.S.C. § 104(a).

Thus, the District Court could not grant the injunctive relief sought by Eaton if the anti-injunction provisions of Section 4 were controlling. In *Boys Markets,* the United States Supreme Court held that the anti-injunction provisions of the Norris-LaGuardia Act did not prohibit a federal court from enjoining a strike where that strike was in

will give his written answer to the grievance within two full working days of the discussion.

*Step III*—A committee designated by the Union and the aggrieved Employee if he desires to be present, on the one side, and the Management on the other side; both sides shall make a sincere effort to resolve the dispute. In case no settlement is reached they shall have the right to submit to Arbitration where applicable.

Any grievance not appealed by the Union from one step of this procedure to the next step within 5 working days through Step III and 35 working days between Step III and Arbitration shall be considered settled on the basis of the last disposition rendered by the Company.

The above time limits may be extended by mutual agreement.

*Section 28.* If after all steps in the grievance procedure have been taken there still remains a matter of dispute between the parties regarding the interpretation of any clause in this Agreement, then the same shall be submitted to Arbitration. A joint letter shall be sent within five (5) days to the Federal Mediation and Conciliation Service after notice has been given to arbitrate a grievance to request a panel of five (5) arbitrators.

Upon receipt of the panel of names, representatives of the Company and the Union shall meet and proceed to select the arbitrator within two (2) weeks. Failing a mutual selection, the parties shall each beginning with the Union, strike alternately one (1) name at a time two (2) names from the panel. The one (1) then remaining shall be the arbitrator and such selection shall be final and binding upon the Company and the Union. The foregoing procedure of first striking a name from the submitted panel will be altered in successive cases, i. e., the Union will strike first on one (1) case and then the Company will strike first in the next succeeding case.

Expenses of such arbitration shall be paid equally by the Employer and the Union.

The decision of the arbitrator shall be final and binding and pending such procedure, there shall be no strike, lockout, slow-down or stoppage of work.

Nothing contained in this Agreement is to be construed as abrogating the Union's right to strike. However, it is mutually agreed that there shall be no strike, lockout, slow-down or stoppage or work until the above grievance procedure, including arbitration where applicable, has been followed in good faith.

direct violation of an express "no-strike" provision of a collective bargaining agreement then in effect between the parties and where both parties to the suit were contractually bound to enter into binding arbitration as to the grievance or dispute that was the cause of the strike. *Teledyne Wisconsin Motor v. Local 238*, 530 F.2d 727 (7th Cir. 1976). The Union argues that both parties to this action were not contractually bound by the Agreement to arbitrate and that as a result the *Boys Markets* exception did not apply.

■ In order to determine whether both parties were contractually bound, we must look to the language of the Agreement itself. Section 27 of the Agreement provides in general terms that any dispute may be settled by use of the grievance procedures detailed in that Section. Section 28 outlines the procedures to be followed in taking a grievance concerning the interpretation of the Agreement, and which was not settled in the grievance procedure, to arbitration. The pivotal language of Section 28 that concerns us today states that:

> The decision of the arbitrator, shall be final and binding and pending such procedure, there shall be no strike, lockout, slow-down or stoppage of work.

> Nothing contained in this agreement is to be construed as abrogating the Union's right to strike. However, it is mutually agreed that there shall be no strike, lockout, slow-down or stoppage of work until the above grievance procedure has been followed in good faith.

While the Union argues that the language stating that the right to strike shall not be abrogated means the Agreement did not contain an express "no-strike" agreement, we must disagree. The language cited by the Union has to be read in the context of the total Agreement. Such a reading makes clear to us that the District Court was correct when it determined that the additional language following that cited by the Union shows an intention that all parties to the Agreement be barred from any strike, lockout, slow-down or stoppage of work until the matter in question was properly taken to arbitration.

■ The Union also argues that under *Buffalo Forge Co. v. United Steel Workers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), the Agreement's language does not meet the requirement that arbitration be mandatory for both parties. The basis for this position is that no provision exists in the Agreement by which the Company must grieve an issue and press it to arbitration. Our reading of *Buffalo Forge* indicates only that a District Court may not enjoin an employee's sympathy strike where the strike was not over any dispute between the Union and the employer even remotely subject to the arbitration provisions of the bargaining agreement. 428 U.S. at 407, 96 S.Ct. 3141. The language from *Buffalo Forge* cited by the Union states that, "The Court [in *Boys Markets*] held that a union could be enjoined from striking over a dispute which it was bound to arbitrate at the employer's behest." 428 U.S. at 406, 96 S.Ct. at 3147. We do not take this to mean, as the Union urges, that in every *Boys Markets* situation there must be a finding that an employer is capable of initiating arbitration. We agree with the analysis in *Avco Corp. v. Local 787, U. A. W.*, 459 F.2d 968 (3rd Cir. 1972), where the court stated:

> [T]he district court held that Avco and the Union 'are not contractually bound to arbitrate the present dispute since the procedure was employee-oriented and since only the union had the right to institute action under the provisions of the agreement'. 325 F.Supp. 588 at 591.

> We believe that this interpretation of the limitations of *Boys Markets* is far too restrictive. All that *Boys Markets* requires is that 'both parties are contractually bound to arbitrate.' 398 U.S. at 254, 90 S.Ct. at 1594, quoting [*Sinclair Refining Co. v. Atkinson,*] 370 U.S. [195] at 228, 82 S.Ct. 1328 [8 L.Ed.2d 440]. It does not require that both parties be capable of initiative arbitration. In this case, the company is bound to arbitrate if the Union elects to pursue that remedy and the Union is bound to arbitrate the disputes

it desires to resolve rather than to resort to a strike. 398 U.S. at 248, 90 S.Ct. 1583. The 'no-strike' clause is the *quid pro quo* which Avco obtained for agreeing to submit to compulsory arbitration. To allow the Union to abandon its remedy of arbitration in order to disregard the 'no-strike' clause would render the collective bargaining agreement illusory and would subvert the policy favoring the peaceful settlement of labor disputes by arbitration.

459 F.2d at 972. *See also Monongahela Power Co. v. Local 2332, I.B.E.W.,* 484 F.2d 1209 (4th Cir. 1973).

Here, as in *Avco,* the terms of the Agreement indicate that Eaton can be compelled to arbitrate if the Union presses a grievance to that stage. The Agreement makes clear that both parties have committed themselves to the binding arbitration of disputes arising under the Agreement. Accordingly, we find that the language of the Agreement met the requirements of *Boys Markets* in that both parties to the suit were contractually bound to enter into binding arbitration.

The Union also argues that the specific disputes presently dividing the parties are not included in the arbitration clause of Section 28. The Union admits in its brief that the grievance procedure of Section 27 applies to "all matter of dispute" between the parties. Section 28 applies to matters of dispute regarding the interpretation of any clause of the Agreement. As has already been established, the main substantive issue in this action is the fifteen per cent wage cut which is contemplated in Section 14 of the Agreement. Clearly, the disputes here in issue qualify under this broad and inclusive language. Similarly, the filing of an unfair labor practice with the National Labor Relations Board does not affect the obligation to arbitrate under the Agreement. *Smith v. Evening News Association,* 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962).

Finally, the Union argues that the injunction should not have issued because all of the prerequisites of the Norris-LaGuardia Act were not met. Yet, as the Union itself notes, in any *Boys Markets* situation the court must be satisfied that the injunction should issue despite the dictates of the Norris-LaGuardia Act. Under *Boys Markets,* a District Court is required to determine that the issuance of an injunction is warranted under the ordinary principles of equity. 398 U.S. at 254, 90 S.Ct. 1583. The Union takes the position that Eaton's failure to furnish information concerning the fifteen per cent wage cut, among other things, amounted to a violation of the equitable doctrine of clean hands. Yet, the District Court determined in its findings that all the prerequisites for the granting of injunctive relief were satisfied and we will not disturb that finding now.

In summary, we find that the language of the Collective Bargaining Agreement intended that both parties be mutually bound to arbitrate grievances arising under that Agreement. Further, whereas the District Court found that all the prerequisites for injunctive relief had been met, we affirm the issuance of the preliminary injunction pursuant to the *Boys Markets* exception to the Norris-LaGuardia Act.

AFFIRMED.