**NEW ORLEANS STEAMSHIP ASSOCIATION et al.**

v.

**GENERAL LONGSHORE WORKERS, ILA LOCAL UNION NO. 1418 et al.**

**Civ. A. No. 80–335.**

United States District Court,
E. D. Louisiana,
Section L Division.

Feb. 5, 1980.

**410**

David E. Walker, Monroe & Lemann, Andrew P. Carter, Alvin J. Bordelon, Jr., New Orleans, La., for plaintiffs.

Victor H. Hess, Jr., New Orleans, La., for defendants.

WICKER, District Judge.

This matter came before the Court on February 1, 1980, for a hearing on a preliminary injunction brought under the Labor Management Relations Act, 29 U.S.C. § 185.

This action arose when members of the defendant Unions, in protest of the Russian invasion of Afghanistan refused to load grain destined for the Soviet Union aboard the *M/V Julia L.*

Plaintiffs in these proceedings seek to enforce the cease and desist orders of three arbitrators who determined that defendants violated the terms of their collective bargaining agreements.

Based upon the record, the evidence adduced at the hearing, the briefs and arguments of counsel and the law applicable to this case, the following opinion will serve as the Court's Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

The following facts are undisputed:

1. Plaintiff, New Orleans Steamship Association (NOSSA) is a Louisiana Corporation composed of various employers who engage in the furnishing of shipping, stevedoring and various services in the Port of New Orleans.

2. Plaintiff, TTT Stevedores of Louisiana, Inc. (TTT), is a member of NOSSA.

3. Defendants are General Longshore Workers, ILA Local Unions No. 1418, 1419 (Locals 1418 and 1419), New Orleans Clerks and Checkers Union, ILA Local Union No. 1497 (Local 1497), and Sack-Sewers, Sweepers, Waterboys and Coopers, ILA Local Unions No. 1683, 1802, AFL–CIO (Locals 1683 and 1802). Defendants are labor organizations doing business in the Port of New Orleans whose members are employed by employer members of NOSSA.

4. Plaintiffs and defendants are engaged in an industry affecting commerce.

5. At all times pertinent hereto there was in full force and effect valid Collective Bargaining Agreements between NOSSA and defendants. (Joint Exhibits 1, 2 and 3).

6. All three agreements contain the following pertinent language:

"(a) *No Strikes—No Lockouts*

There shall be no strikes, work stoppages, nor shall there be any lockouts.

"(b) *Disputes Procedure and Arbitration*

The parties accept the principle that any dispute involving the interpretation or application of the terms of this agreement shall be resolved in an orderly and expeditious manner. They commit themselves to the procedure outlined below . . . and failure to deal with disputes under the disputes procedure shall constitute a violation of this agreement.

"(c) These steps shall be followed to insure prompt resolution of disputes.

. . . . .

The arbitrator's authority shall be limited to interpretation and application of the terms of this agreement. The arbitrator shall have no authority to render decisions which have the effect of adding to, subtracting from, or otherwise modifying the terms of this agreement. The decision of the arbitrator shall be final and binding on both parties . . .

"(d) . . . The arbitrator shall hold a prompt hearing . . . In such case, the arbitrator shall make findings of fact concerning the alleged violation and shall prescribe appropriate relief, including an order to desist therefrom.

. . . ."

(Joint Exhibit 1, Article XVII; Joint Exhibit 2, Article XII and Joint Exhibit 3, Article XIV).

7. On October 20, 1975, the United States entered into an agreement to sell up to eight million metric tons of grain to the Soviet Union over a five year period commencing October 1, 1976. Although on January 7, 1980, the President of the United States terminated the exportation of domestic agricultural commodities and products to the Soviet Union, he, "in the national security and foreign policy interest of the United States", directed the Secretary of Commerce to issue "Export Licenses" to the extent necessary to fulfill the 1975 Agreement. (See "Statement of Interest of the United States", Document No. 2).

8. On January 23, 1980, a work stoppage occurred when members of the defendant Unions refused to either work the *M/V Julia L* or to load her with grain destined for the Soviet Union.

9. The Soviet bound grain which was to be loaded aboard the *Julia L* was part of the 1975 Agreement. (Document No. 2).

10. The work stoppage in this case was not a result of a dispute with the employer but was a political protest against the Soviet invasion of Afghanistan.

11. NOSSA promptly invoked expedited arbitration proceedings as provided under each of the agreements (See Exhibits attached to Joint Exhibits 7, 8 & 9).

12. After hearings were conducted (Joint Exhibits 7, 8 & 9), all three arbitrators found that defendants had violated the no strike clauses of the contracts and issued cease and desist orders. (Joint Exhibits 4, 5 & 6).

13. On January 27 and 28, 1980, Arbitrators John Caraway and John J. Maxwell ordered Locals 1418, 1419 and 1497 to cease and desist from engaging in any strikes and/or work stoppages in connection with the loading or unloading of exempt grain cargo aboard the *M/V Julia L*, while Arbitrator John J. McAulay ordered Locals 1638 and 1802 to cease and desist from participating in or in any way aiding or promoting any work stoppage with reference to grain or other cargo having a United States Export License and not interdicted by the President of the United States. (Joint Exhibits 4, 5 & 6).

14. This suit was filed when members of the defendant unions, after having been notified of the arbitrators orders, refused to work the *Julia L.*

15. On January 29, 1980, this Court issued an order temporarily restraining the defendants from inducing a boycott by its members to load or unload grain destined for the Soviet Union aboard the Motor Vessel *Julia L.*

16. Subsequent thereto, the vessel was loaded and on January 31, 1980, she sailed from the Port of New Orleans.

There is no doubt that the sympathy of the country is with the longshoremen. None of us can condone what the Russians have done in Afghanistan. However,

whether the defendant unions are morally justified in refusing to load grain bound for the Soviet Union is not at issue in this case.

The determination of this country's foreign policy is also not at issue. That is a matter for the Executive and Legislative Branches of Government.

The sole issues to be determined are matters of contract, i. e. whether the arbitration decision of Arbitrator McAulay should be enforced and whether the decision of Arbitrators Maxwell and Caraway should be extended.

Title 29, United States Code, Section 185(a) provides:

"(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

. . ."

It is the contention of the unions that refusal by their members to load grain aboard the *M/V Julia L* is a political issue; that the only disputes subject to arbitration are those involving the interpretation or application of the Collective Bargaining Agreements and since there was no such dispute between the unions and the employers, the arbitrators had no authority under the agreements to order defendants to load grain destined for Russia. The employers contend otherwise.

The Court finds that the arbitrators did not exceed their authority under the contracts at issue.

The Collective Bargaining Agreements in this case contain identical, unqualified no strike—no work stoppage clauses. There are no exceptions to this provision. Additionally, both the employer and the defendant unions committed themselves to binding arbitration of "all disputes involving the interpretations or applications of the terms of the agreement".

The Courts have repeatedly held that a no strike obligation is the quid pro quod for an undertaking by the employer to submit grievance disputes to the process of arbitration. *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

"The net effect of the arbitration process is to remove completely any ambiguity in the agreement as it applies to an unforeseen or undescribed set of facts . . . ." *Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO, Etc.*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976); Stevens, J., dissenting at 428 U.S. 425–426, 96 S.Ct. 3156.

■ Each of the contracts at issue has an arbitration clause broad enough to determine the meaning and application of the no-strike clause itself. Defendants in this case caused a work stoppage and the parties disagree whether this act breached the terms of the collective bargaining agreements. Whether a work stoppage such as this, that is, one occasioned by political protest rather than by employer-union dispute, violated the no-strike clauses of the agreements is a dispute involving interpretation of the agreements and is an issue to be determined by the arbitrator. *Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO, Etc., supra*, 428 U.S. at 405, 96 S.Ct. at 3146; *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *West Gulf Maritime Assn., et al. v. International Longshoremen's Assn. AFL–CIO*, 413 F.Supp. 372 (S.D.Tex.1975) aff'd 531 F.2d 574 (5th Cir.1976).

■ In a suit to enforce an arbitration award, the Court's role is very limited. It cannot review the merits of the award, even in deciding the question of arbitrability. Nor can it overrule the arbitrator's interpretation of the agreement because it disagrees with that interpretation. *International Union of Electrical, Radio and Machine Workers, AFL–CIO v. Markle Manufacturing Co.*, 582 F.2d 10 (5th Cir.1978)

cert. denied, *Broussard v. United States,* 440 U.S. 935, 99 S.Ct. 1279, 59 L.Ed.2d 493; *International Association of Heat and Frost Insulators and Asbestos Workers, Local 66, AFL–CIO v. Leona Lee Corp.,* 489 F.2d 1032 (5th Cir.1974) cert. denied 419 U.S. 829, 95 S.Ct. 51, 42 L.Ed.2d 54; *International Brotherhood of Pulp, Sulfite and Papermill Workers v. St. Regis Paper Co.,* 362 F.2d 711 (5th Cir.1966).

The unions also contend that the Court cannot expand upon the arbitrators' awards but can only enforce them as written.

From the evidence adduced at the hearing on this matter, the Court finds that although the United States, to fulfill its 1975 Agreement, issued export licenses involving future shipments of grain to the Soviet Union (Plaintiff's Exhibits 1, 2 and 3), members of the defendant unions will not load any grain or work any vessels bound for the Soviet Union so long as the boycott announced by Teddy Gleason, President of the ILA, AFL–CIO (Joint Exhibit 1) is in effect. (Testimony of Norris Plaisance, President of Local 1418; Alcee P. Honore, President of Local 1419; James T. McCleland, Jr., Area Vice President of ILA and President of Local 1497).

■ The Norris-LaGuardia Act, 29 U.S.C. § 104, does not bar the granting of injunctive relief enforcing an agreement to submit disputes to binding arbitration, *Boys Market, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), nor does it prohibit that same relief to enforce the arbitral decision. *Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO, Etc., supra,* 428 U.S. at p. 405, 96 S.Ct. at p. 3146; *United Steelworkers of America v. Enterprise Wheel and Car Corp., supra; New Orleans Steamship Association v. General Longshore Workers, ILA Local Union No. 1418,* 389 F.2d 369 (5th Cir.1968) cert. denied 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968).

■ Contrary to the unions' position, the Court concludes that although the *Julia L* has sailed and injunctive relief as to that vessel is moot, it has the right to extend the decision of Arbitrators Maxwell and Caraway to include all grain which has been issued a United States Export License.

It is clear that the boycott will recur on future shipments of grain to the Soviet Union. The issue as to whether a work stoppage occasioned by political protest breached the collective bargaining agreements between the parties to this suit has already been decided. Therefore, it matters not whether the work stoppage involved Russian bound grain to be loaded aboard the *Julia L* or any other vessel. There is no reason to submit the same issue to arbitration should another ship present itself for loading. See, *Pacific Maritime Association v. International Longshoremen's and Warehousing Union,* 454 F.2d 262 (9th Cir.1971).

From the evidence adduced at this hearing, the Court finds that the defendant unions have breached the no strike clause of the contracts and they will continue to do so unless restrained, these breaches have caused and will cause irreparable injury to the employer and a strike such as this does not further the interest of either the employer or the union but on the contrary both will suffer.

Under these circumstances the Court finds that a preliminary injunction should issue in this matter,

IT IS THEREFORE ORDERED that defendants and each of them, their officers, agents, representatives, employees, attorneys and those persons in active concert or participation with them, be preliminarily enjoined by this Court from engaging or participating, inducing, encouraging or ordering any work stoppage in connection with the loading or unloading of grain in the Port of New Orleans, which grain is destined for the Soviet Union, and having a United States Export License issued by the United States Department of Commerce. This order will remain in effect only so long as the current policy of the United States stands.