TEAMSTERS UNION LOCAL NO. 115, OF PHILADELPHIA, PENNSYLVANIA, AFFILIATED WITH the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Appellee,

v.

DESOTO, INC., Pennsauken, New Jersey, Appellant.

TEAMSTERS UNION LOCAL NO. 115, OF PHILADELPHIA, PENNSYLVANIA AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Appellant,

v.

DESOTO, INC., Pennsauken, New Jersey, Appellee.

Nos. 83–5791, 83–5792.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Dec. 23, 1983.

Decided Jan. 19, 1984.

Richard H. Markowitz, Markowitz & Richman, Philadelphia, Pa., for appellant.

Jerald R. Cureton, Pechner, Dorfman, Wolffe, Rounick & Cabot, Philadelphia, Pa., for appellee.

Before HUNTER, GARTH, and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

Teamsters Union Local No. 115 ("Union") and DeSoto, Inc. ("DeSoto") each appeal from an order of the district court enforcing in part a modified arbitrator's award rendered under a collective bargaining agreement. We affirm the district court's judgment but for reasons which differ from

those of the district court.[1] In doing so we do not disturb the modified arbitrator's award.

### I.

DeSoto, a nationwide manufacturer of paint and industrial coatings, operated a plant in Pennsauken, New Jersey. The Union represents the production and maintenance employees at the plant. DeSoto and the Union entered into a collective bargaining agreement (CBA), which was in effect from January 15, 1980 to January 15, 1983. Among other provisions, the CBA provided that: (1) DeSoto was required to obtain the good faith consent of the Union for any decision to move the plant; (2) DeSoto could subcontract out work that in certain circumstances (allocation of products among plants) could result in layoffs; and (3) DeSoto was required to bargain about unilateral changes in working conditions. The CBA also provided for binding arbitration to settle grievances, including objections to unilateral changes.

On February 4, 1982, DeSoto closed its Pennsauken plant. It did not seek or obtain the Union's consent. The Union filed a complaint in the district court contending that the plant closing violated the CBA, and sought a mandatory injunction requiring DeSoto to reopen the plant pending arbitration. On March 31, 1982, the court enjoined DeSoto from disposing of the plant's physical assets and the property, pending arbitration, and ordered arbitration to be completed within 60 days. This injunction is still in effect.

On April 9, 1982 the Union filed an unfair labor practice charge regarding the decision to close the plant, asserting violations of sections 8(a)(1), (3) & (5) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(a)(1), (3), & (5) (1976).

The arbitrator conducted a hearing on May 14, 1982. At the hearing the Union contended the closing violated the plant re-location provision. DeSoto argued that relocation was permitted under the subcontracting clause. The Union requested that the arbitrator order the plant to be reopened. The arbitrator was hospitalized soon after the hearing, and as a result did not issue his award until August 16, 1982. On that date, he issued an opinion finding that the closing violated the CBA, and he ordered the plant reopened and the workers recalled, and awarded back pay from the date of the closing to the date each employee was recalled.

DeSoto did not comply, and filed a motion to vacate the award with the district court; the Union filed a cross-motion to enforce. The district court, after a hearing, remanded to the arbitrator for "reformulation" of the arbitrator's remedy. The court held that the arbitrator's interpretation of the CBA was reasonable, but the reopening remedy was "irrational." In its opinion, the court stated that it was vacating that portion of the award requiring DeSoto to reopen the plant, and that it was remanding to the arbitrator to reassess the circumstances and fashion a fair and economical remedy. The order remanded to the arbitrator to reformulate the award consistent with the opinion.

The district court's order was entered on November 10, 1982. The arbitrator thereupon amended his award on November 24, 1982. The amendment consisted of deleting so much of his original award as required DeSoto to "restore its plant in Pennsauken, New Jersey to substantially the same manufacturing condition in which it was operating on February 4, 1982; recall to work all employees employed on that date; and resume its prior operation." The district court ordered DeSoto to comply with the modified award by an order dated December 6, 1982. On December 21, 1982, an amended order was entered by the district court which clarified the fact that back pay was to be provided only for production and

---

1. We may affirm the order of a district court for any reason supported by the record. *E.g., Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 157, 82 L.Ed. 224 (1937); *Myers v.*

*American Dental Ass'n,* 695 F.2d 716, 725 (3d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983).

maintenance employees covered by the CBA. The district court thereafter entered a certification pursuant to Fed.R.Civ.P. 54(b).[2] These appeals, timely filed, followed.[3]

While these proceedings were pending, the NLRB, on March 4, 1983, issued an unfair labor practice complaint against De-Soto for the plant closing. The complaint charged violations of NLRA §§ 8(a)(1), (3) & (5). After the hearing, the ALJ on June 23, 1983, found DeSoto had acted illegally only in failing to bargain with the Union over the effects of the closing, and that DeSoto had no obligation to bargain over the decision to close because that action was not a mandatory bargaining subject; the ALJ also found, inter alia, that the closing was not an unlawful mid-term modification of the CBA.[4]

## II.

### A.

■■■■ DeSoto appeals from that part of the district court's order affirming the arbitrator's ruling that DeSoto violated the CBA by closing the plant. Federal courts have a very limited scope of review when passing on the validity of a labor arbitration award. The arbitrator's award must be enforced "so long as it draws its essence from the collective bargaining agreement." *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). Thus a court may only set aside an arbitra-

tor's award interpreting a CBA when the interpretation cannot be said to be in any rational way derived from the agreement.

[A] labor arbitrator's award does "draw its essence from the collective bargaining agreement" if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award.

*Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1128 (3d Cir.1969).

This deference to the arbitrator's decision advances the Congressional policy of peaceful resolution of labor disputes through binding arbitration, by investing the decision with finality. *See Enterprise Wheel,* 363 U.S. at 596–99, 80 S.Ct. at 1360–62. "It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his," *id.* at 599, 80 S.Ct. at 1362, or "because the court believes that its own interpretation would be the better one," *W.R. Grace & Co. v. Local 759, International Union of United Rubber Workers,* —— U.S. ——, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983) (citing

---

**2.** The district court's December 6, 1982 order provided that DeSoto was to pay back pay from February 4, 1982; make contributions to the various pension plans and funds as required by the CBA from February 4, 1982; deduct dues from the various payments; and to return to the arbitrator if disputes as to the amounts of such payment arose.

**3.** Notices of appeal were initially filed by the Union on December 22, 1982 and by DeSoto on January 12, 1983. The Union moved to dismiss DeSoto's cross-appeal as untimely under Fed.R. App.P. 4. Because both appeals were from a judgment that was nonfinal, in that the arbitration award failed to quantify the damages to be awarded as back pay, the appeals were dismissed, *Teamsters Union Local No. 115 v. De-*

*Soto, Inc.,* 723 F.2d 898 (3d Cir.1983) (unpub. mem.). *See Public Service Electric & Gas Co. v. System Council U–2, International Brotherhood of Electrical Workers,* 703 F.2d 68 (3d Cir.1983). Since both appeals were premature, the Union's motion to dismiss DeSoto's cross-appeal was mooted. Our order of dismissal was without prejudice, however, to the right to apply to the district court for a Rule 54(b) certification. As noted in text, on October 17, 1983, the district court certified its orders as final pursuant to Fed.R.Civ.P. 54(b).

**4.** At this writing, we have not been informed of the Board's review (if any) of the ALJ's decision. However the Board's decision may read, in light of our analysis *infra,* it would not affect our ultimate disposition.

*Enterprise Wheel,* 363 U.S. at 596, 80 S.Ct. at 1360).

The issue before the arbitrator here was whether the decision to close the Pennsauken plant and transfer all production to existing plants in Greensboro, Columbus, and Joliet was a prohibited "move" within the meaning of Article XXV of the CBA or a permissible "allocation of products" within the meaning of Article XXVI. Article XXV, headed "Plant Location," states:

> The Company shall not move its plant from its present location beyond the radius of twenty-five (25) miles without the written consent of the Union, but the Union shall not withhold its consent for arbitrary and capricious reasons.

Article XXVI, headed "Subcontracting," states:

> The Employer will not subcontract or transfer out work which results in a layoff of its employees, except that this limitation on subcontracting or transferring out shall not be applicable to business peaks or valleys or to the allocation of products among the various plants of the Company for business reasons.

█ The arbitrator found that Article XXV and not Article XXVI, applied to the closing of the Pennsauken plant. He rested that conclusion primarily on the language of the contract, and the history of bargaining with respect to its provisions. He found that Article XXV prohibited the elimination of the entire workforce by a move of production to a distance that would make employees' transfers infeasible. He distinguished that situation from an Article XXVI situation, which he interpreted as allowing the employer to remove *some* work from the plant. He reasoned that the parties would not have intended that the company be allowed to "allocate the plant out of existence" by transferring *all* work elsewhere. He found that the term "move," within the meaning of Article XXV, did not necessitate moving production to a "brand new facility," since the effect on the employees of transferring all work and closing the plant would be the same regardless of where the work ended up, particularly since

the purpose of the clause (he found) was to protect against the total loss of all the jobs in the bargaining unit through a shift of jobs to a location to which the employees could not transfer.

While the arbitrator's interpretation, to some extent, appears to be a dubious one, that is not a sufficient ground for overruling it. *Kane Gas Light & Heating Co. v. International Brotherhood of Firemen,* 687 F.2d 673, 679–81 (3d Cir.1982). The two clauses at issue (XXV and XXVI) are at least open to interpretation. DeSoto argues that Article XXVI is an unambiguous statement that the company could "allocate" whatever production it wanted, elsewhere. We do not find persuasive the contention that Article XXVI is unambiguous. It is at least open to interpretation whether "allocation of products among the various plants" includes a total shutdown of the Pennsauken plant and transfer of all products to other plants.

DeSoto also argues that Article XXV cannot be applicable to the facts because for there to be a "move" there must be a newly constructed plant to receive the transferred production. DeSoto's argument amounts to a different interpretation of Article XXV, but it does not necessarily follow that the arbitrator's interpretation was irrational or that it did not draw its essence from the parties' agreement. We have been instructed that even when the basis for the arbitrator's decision may be ambiguous, we are nevertheless not entitled to review the merits of a contract dispute. *W.R. Grace, supra,* 103 S.Ct. at 2182.

DeSoto also argues that the arbitrator grounded the interpretation on a misconstruction of the "law of the shop," in that he failed to take proper account of the Union's acquiescence, in 1977, to a reallocation of some products to other plants, which DeSoto argues, shows that the parties did not intend for transfers of product lines to count as anything but "allocation." We cannot say, however, that the arbitrator's interpretation of this event is irrational. The arbitrator distinguished between partial and total reallocation, noting that the

difference is not merely one of degree: "The difference is like that between a collision in which the right side of your car is scraped and dented and one in which it is totalled." (App. 258a.) Again, we cannot say that such a distinction, when derived from the terms of the CBA, is so lacking in rationality that the award must be vacated.

### B.

■ DeSoto also argues that the arbitrator's decision must be overruled on the ground that the ALJ in the unfair labor practice proceeding had found that the decision to close the plant was not a mandatory subject of bargaining. We are not persuaded by this argument, nor by DeSoto's additional argument that the arbitrator should be overruled on the basis of the district court's holding that the ALJ's decision was not likely to be reversed (and that therefore the injunction would not be extended pending appeal to the General Counsel).[5]

Citing *Carey v. Westinghouse,* 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1963), for the proposition that the ALJ's decision must take precedence over the arbitration award, DeSoto argues that if the decision to close the plant was not a mandatory subject of bargaining the company could not be held to have bargained about it in the CBA. However, *Carey* only held that the mere fact that the NLRB has jurisdiction over a dispute, otherwise arbitrable, does not justify a refusal to arbitrate. In so holding, the Court in dictum stated that "[s]hould the Board disagree with the arbiter [in a later proceeding dealing with the dispute] ... the Board's ruling would, of course, take precedence; and if the employer's action had been in accord with that ruling, it would not be liable for damages under [Labor-Management Relations Act] § 301." *Id.* at 272, 84 S.Ct. at 409.

Courts have relied on this *Carey* dictum in refusing to enforce arbitration awards of damages in actions under § 301. *E.g., Local 7–210, Oil, Chemical, & Atomic Workers v. Union Tank Car Co.,* 475 F.2d 194 (7th Cir.), *cert. denied,* 414 U.S. 875, 94 S.Ct. 68, 38 L.Ed.2d 120 (1973); *In re Local 259 v. Kellogg Pontiac Sales Corp.,* 392 F.Supp. 1044 (S.D.N.Y.1975). But it is only in those cases in which there is a conflict between the Board's ruling and an arbitrator's that *Carey* applies. Accordingly, the threshold question in this case is whether the rights and the remedies held to exist under the CBA are in conflict with the ALJ's ruling on the rights and the remedies as they exist under the statute. *See Luckenbach Overseas Corp. v. Curran,* 398 F.2d 403, 405–06 (2d Cir.1968).

The NLRA imposes a duty upon the employer to bargain in good faith "with respect to wages, hours, and other terms and conditions of employment." NLRA §§ 8(d), 8(a)(5). A unilateral change in wages, hours or "other terms or conditions" violates this duty to bargain. *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). While the statutory phrase describing mandatory subjects of bargaining is open-ended, the court decisions construing the statute have established some limits; one of these is the economically motivated decision to close part of the employer's business. *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 686, 101 S.Ct. 2573, 2584, 69 L.Ed.2d 318 (1981). But the obligation to bargain under the NLRA does not delimit the scope of permissible bargaining. "There is an important difference ... between permitted bargaining and mandated bargaining." *Id.* at 683, 101 S.Ct. at 2583. *See also id.* at 674, 101 S.Ct. at 2578. ("Although parties are free to bargain about any legal subject, Congress has limited the mandate or duty to bargain to matters of 'wages, hours, and other

---

**5.** Apart from the March 31, 1982 injunction by which the court enjoined DeSoto from disposing of its assets pending arbitration, the court had also entered a consent decree which enjoined DeSoto from disposing of the plant and assets pending the outcome of the unfair labor practice proceeding. On August 25, 1983, the district court refused to extend this latter injunction, which then expired. The earlier injunction apparently still continues in force. *See* note 13 *infra.*

terms or conditions of employment.' "). The critical difference is that no rights arise under the statute if a party refuses to bargain over a nonmandatory subject. But it does not follow that there is a right under the statute to refuse to comply with a contract dealing with nonmandatory subjects. To the contrary, "[a] matter that is not a mandatory subject of bargaining ... may be raised at the bargaining table to be discussed in good faith, and the parties may incorporate it into an enforceable collective-bargaining agreement." *Id.* at 675 n. 13, 101 S.Ct. at 2579 n. 13.

Thus, assuming—as is the case here—the arbitrator did not err in finding that the parties bargained about the decision to close the plant, the ALJ's finding that the decision was not a mandatory subject of bargaining does not conflict with the arbitration award. As a consequence, DeSoto's argument that if "the decision ... was not bargainable, it was also not arbitrable" (Br. 9) is without merit.[6]

### III.

#### A.

The same narrow scope of review applicable to the arbitrator's finding of a violation of the CBA is applicable to the arbitrator's choice of remedy for the violation. The principle of deference enunciated in *Enterprise Wheel, supra,* 363 U.S. at 597, 80 S.Ct. at 1361, demands that the arbitrator be given equal, if not greater, latitude to fashion an award:

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

The district court concluded that the reopening remedy was "irrational." In so concluding, the court focused on the waste of economic resources that would result from forcing DeSoto to open the plant for "a few weeks": the court noted that DeSoto had "virtually assured" all parties that it would close the plant at the end of the contract (January 15, 1983).[7] The court also apparently relied on its intuition that the employees would be better able to search for new jobs (on the assumption that the plant would close), and that forcing a reopening might create animosities and might make DeSoto unwilling to provide the employees with new jobs or benefits. Finally, the court laid emphasis on the delay between the date it had originally contemplated for the award to issue, and the date of actual issuance; it asserted that

---

6. DeSoto also argues that the ALJ's use of the term "reallocation" in his opinion constitutes a finding of fact that the closing was not a "move," and should be given precedence over the arbitrator's determination, under *Carey.* Even if *Carey* would require that the arbitrator's finding should give way, DeSoto's contention that the ALJ "found" no "move" within the meaning of the contract is a gross mischaracterization of the ALJ's decision. First, the ALJ did not "find" that the work was "reallocated" within the meaning of the CBA; rather, he expressly declined to decide the *contract* issue (Supp.App. at 7). Second, the ALJ never made any finding in express terms that the products were "reallocated" even though he used that term in a portion of his discussion.

7. App. 298a. Since the order was entered November 6, 1982, there were actually at least nine weeks left. When the arbitration award was entered, August 16, 1982 there were five months left.

even if reopening were originally feasible, the delay made it much less so.[8]

The district court's analysis, however well-intentioned and reasoned, is nevertheless incompatible with the policy of deference to arbitration expressed in *Enterprise Wheel, supra.* First, the analysis is more akin to that which a court in equity would utilize, with its stress on feasibility and the adequacy of back pay in lieu of reopening. This "balancing" process is contrary to the district court's standard of review, as mandated by *Ludwig Honold* and *Enterprise Wheel*—a standard which proscribes *de novo* review of an arbitrator's award. (As discussed *infra,* though, these considerations are not wholly irrelevant).

Second, the court appears to have based its conclusions on evidence as to DeSoto's intention to close the plant, and the time and expense involved—evidence that was not before the arbitrator.[9] Again, this practice is incompatible with deference to the arbitrator: "[A] court is precluded from overturning an award for errors in assessing the credibility of witnesses, in the weight accorded their testimony, or in the determination of factual issues." *NF & M Corp. v. United Steelworkers of America,* 524 F.2d 756, 759 (3d Cir.1975). *See also Drivers Local 21 v. Akers Motor Lines, Inc.,* 582 F.2d 1336, 1342 (4th Cir.1978) (district court improperly held hearings and made findings of fact: "The function of gathering and evaluating evidence is for the arbitrator."), citing *Buffalo Forge Co. v. United Steelworkers of America,* 428 U.S. 397, 412, 96 S.Ct. 3141, 3149, 49 L.Ed.2d 1022 (1976) (court may not enjoin sympathy strike, pending arbitration decision, based on its conclusion after hearing and fact-finding that strike is violation of CBA, because "It is incredible to believe that the courts would always view the facts and the contract as the arbitrator would.").[10]

**8.** Two excerpts from the district court's opinion capture the essential reasons for the district court's reluctance to order the reopening of the plant.

The problem, simply stated, is as follows: DeSoto closed down its plant in an effort to cut unnecessary costs. Its projections in this regard have been borne out and DeSoto has realized savings of $400,000 dollars per month (or 4.8 million dollars per year). As a practical matter, there is little that the union can do to induce the company to keep the plant open after January 15, 1983. (The total labor costs in the plant were only 2.7 million dollars). In fact, DeSoto has virtually assured all parties involved that it will cease operating the plant on that date. By ordering the company to reopen the plant, the arbitrator has, in effect, forced it to spend almost $800,000 dollars to resume operations for just a few weeks. This will result in a tremendous waste which will eventually work to everyone's detriment.

\* \* \* \* \* \*

The plight of the union employees must also be considered. If the arbitrator's remedy is enforced, the workers will be hired for a limited time, only to be released once again after the collective bargaining agreement expires. The job they will be given is one that their employer obviously feels is worthless. On the other hand, if the plant is not reopened, the workers would receive the same salary and could continue a full scale search for new jobs. At the same time they would still be able to negotiate with DeSoto for better benefits and possibly even new jobs. By forcing the company to reopen, however, Local 115 would most likely hurt its own cause. The tremendous waste that will invariably occur once the plant reopens will probably push DeSoto into an untenable bargaining posture. As such, the negotiating process can only suffer, thereby injuring all parties.

As the above problems indicate, the remedy proposed by the arbitrator, which may have been feasible six months ago, cannot be justified at this late date.

**9.** DeSoto disputes this, but the record does not support DeSoto's argument. At most there is evidence that the company's February, 1982 position on closing was firm.

**10.** DeSoto contends that the district court's findings of fact made at the March 31, 1982 injunction hearing should bind the arbitrator, inasmuch as arbitration proceeded under the court's order which also provided for the injunction. But the issuance of an injunction cannot displace the principles governing court deference to arbitration awards. This is so because to the extent the court made findings with respect to the feasibility and the equity of requiring the plant to be reopened or kept open, it did so in order to decide questions different from the issues the arbitrator was to decide. The issues before the court were the arbitrability of the dispute, whether closing would frustrate arbitration, and whether an injunction (to reopen) would be equitable. *See* App. 40a. These are issues separate and apart

Finally, the arbitrator could have rationally derived the reopening remedy from the contract and the law of the shop. The arbitrator reasoned (contrary to the district court's assertions) that reopening the plant would have restored the status quo and so would have re-established the parties' prior bargaining positions. In that circumstance, the Union would have been in a strong position to bargain if DeSoto's decision to close the plant materialized. That the district court concluded otherwise—i.e., that the animosity generated would vitiate the Union's bargaining strength—is irrelevant under the teachings of *Enterprise Wheel* and *Honold*. It is not the function of the court to assess and evaluate the bargaining process. That function is peculiarly for the arbitrator.

■ In deciding that the remedy was irrational, the district court apparently reasoned that the reopening costs outweighed whatever bargaining power a plant reopening would restore to the Union. However, the question is not whether the remedy is the best remedy, but rather, whether the remedy is rational and justified. Plant reopening is not an unprecedented remedy, *see, e.g., Sidele Fashions, Inc.,* 36 Lab.Arb. 1364 (1961) (Dash, Arb.), nor is the judicial enforcement of such a remedy unprecedented, *e.g., Selb Mfg. Co. v. Machinists,* 305 F.2d 177 (8th Cir.1962).

### B.

However, the considerations about which the district court was concerned (reopening costs, practical problems of relocating plant personnel, little benefit to employees) are not wholly irrelevant to deciding whether a

remedy should be enforced. This court has previously held that we will not enforce Board orders requiring an employer to bargain over its decision to close a plant where bargaining would be futile. *ABC Trans-National Transport, Inc. v. NLRB,* 642 F.2d 675, 686–87 (3d Cir.1981); *Brockway Motor Trucks, Inc. v. NLRB,* 582 F.2d 720, 740–41 (3d Cir.1978). In both *ABC* and *Brockway* the employer ceased operations in the area subsequent to the plant closing, so that enforcement of the bargaining order would "require [the employers] to engage in a seemingly futile task." *ABC,* 642 F.2d at 687; *see Brockway,* 582 F.2d at 740. This aversion to enforcement of fruitless bargaining orders after a plant closing is equally applicable to the enforcement of arbitrator-ordered remedies requiring the employer to reopen a plant, and reinstate employees. *See UFI Razor Blades, Inc. v. District 65, Wholesale, Retail, Office & Processing Union,* 610 F.2d 1018, 1022–23 (2d Cir.1979).

■ The question of whether an arbitrator-ordered remedy will be futile is generally a question that is to be decided by the arbitrator, rather than the court. This is because it is a question of the propriety of the remedy under the contract, rather than a question of whether the award results from fraud, is based on legitimate proceedings, is definite enough to be enforced, or is contrary to statute or public policy. These latter issues are the only issues, other than the issue of whether the arbitrator's award draws its essence from the parties' agreement, that the court may decide. *See Honold, supra,* 405 F.2d at 1128–29 n. 27.

from the contractual issues of the parties' rights and an appropriate remedy if rights were violated, all of which the arbitrator was required to decide. The district court's findings of fact, therefore, do not in any way control the arbitrator's factfinding.

In addition, while *Buffalo Forge Co. v. United Steelworkers of America,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), addressed the question of the scope of deference to arbitrator's fact findings in the context of a request for an injunction against a strike, where the Norris-LaGuardia Act, 29 U.S.C. §§ 101–15

(1976), applied, its rationale is broad enough to cover proceedings in which an injunction is sought that does not relate to a strike. The *Buffalo Forge* Court noted that "the parties have agreed to submit to grievance procedures and arbitrate, not to litigate. They have not contracted for a judicial preview of the facts and the law .... [T]he parties' agreement to adjust or to arbitrate their differences themselves would be eviscerated if the courts for all practical purposes were to try and decide contractual disputes at the preliminary injunction stage." 428 U.S. at 411–12, 96 S.Ct. at 3149.

The arbitrator's award is not, as a rule, open to remand. Instead, the applicable principle is that "once an arbitrator has made and published a final award his authority is exhausted and he is *functus officio* and can do nothing more in regard to the subject matter of the arbitration." *McClatchy Newspapers v. Central Valley Typographical Union*, 686 F.2d 731, 734 (9th Cir.1982), quoting *La Vale Plaza, Inc. v. R.S. Noonan, Inc.*, 378 F.2d 569, 572 (3d Cir.1967). However, as to any issue that has been submitted, but has not been adjudicated, the issue remains open to the arbitrator for subsequent determination. *La Vale, supra*, 378 F.2d at 573. Thus a court will not enforce an incomplete award under LMRA § 301. *United Mine Workers v. Barnes & Tucker Co.*, 561 F.2d 1093 (3d Cir.1977). Where the award constitutes only a partial resolution of the issues, remand is appropriate. *Hanford Atomic Metal Trades Council v. General Electric Co.*, 353 F.2d 302 (9th Cir.1966); *cf. Public Service Elec. & Gas Co. v. System Council U–2, International Brotherhood of Electrical Workers*, 703 F.2d 68 (3d Cir.1983) (remand to arbitrator where failure to complete resolution of submitted issue deprives court of jurisdiction). Similarly, where an award generates a collateral dispute about its scope or application, the question of whether the award will be enforced is for the arbitrator and not the court. *United Mine Workers v. Consolidation Coal Co.*, 666 F.2d 806 (3d Cir.1981).

The sum of these principles is that there is nothing that prevents a remand for reconsideration of an issue that was *not* decided by the arbitrator, or that requires clarification or further arbitral attention in order for a court to enforce the award. The question of whether enforcement will be futile under changed circumstances is at bottom a question of whether the award is applicable in all future circumstances, or just under the circumstances existing at the time of the award. Thus the question of futility should be a question considered by, and answered in the first instance by, the arbitrator.

Although, as we have noted *supra*, a court should not consider additional evidence in deciding whether to enforce an award, the court clearly must be permitted to consider whether a remand is justified, and in that connection may take new evidence. The kind of evidence to be presented in order for a remand to be justified is evidence that was not available at the time of the initial arbitration proceedings; otherwise the principles of deference to arbitrator's fact finding and of finality would be offended. *See Mogge v. District 8, International Association of Machinists*, 454 F.2d 510, 513 (7th Cir.1971) (where evidence that contract had expired was available at time of arbitration, but was not presented, court could not consider it in deciding whether to enforce award). The mere discovery of previously existing evidence is insufficient. *See Washington-Baltimore Newspaper Guild v. Washington Post Co.*, 442 F.2d 1234 (D.C.Cir.1971). Thus for the issue of futility to be properly raised with respect to an arbitrator-ordered award, circumstances bearing on the award must have drastically changed from the circumstances which existed at the time of the arbitration proceeding. *See UFI Razor Blades, supra*, 610 F.2d at 1023.

Here, DeSoto, when it sought to vacate the arbitrator's award, presented sufficient evidence of changed circumstances to warrant a remand. The evidence was sufficient because it consisted of a peculiar combination of circumstances, which arose by reason of the long delay between the initial proceedings before the arbitrator and the proceedings before the district court to vacate the arbitrator's award. The result of this delay was that the CBA was about to expire when the district court's order was entered. There was no indication that the CBA would be renewed. To the contrary, DeSoto has consistently maintained that it would not enter into a new agreement. In this situation the high costs of reopening and the practical problems of personnel relocation and material displacement achieved dramatic significance. The short time remaining before the expiration

of the CBA also dramatically decreased the possible benefits that reopening could bring to the employees.

Thus, under these circumstances the district court would have been justified in remanding to the arbitrator to take evidence and determine whether the remedy of reopening was futile. To the extent that this question (as we have indicated) is a question for the arbitrator to decide, the district court, while justified in remanding for that purpose, was not justified in answering that question itself by vacating the award on equitable grounds. Rather, the evidence presented by DeSoto, together with the changed circumstances—e.g., imminence of expiration of the CBA—of which the court could take judicial notice, was sufficient to raise the issue of futility—an issue then to be decided by the arbitrator.

On remand, the arbitrator did not take new evidence, although he was free to do so. Nor does his opinion after remand discuss or analyze the matters which the parties had brought before the district court. Instead he interpreted the court's order as compelling him to reformulate his award, so as to delete the reopening remedy. Without more, and without consideration of the change in economic circumstances, the pending expiration of the CBA, the lack of benefit to the employees, the lack of purpose in reopening, and indeed the entire question of whether a reopening remedy would be an expensive and meaningless exercise in futility, the arbitrator complied with the court's order on remand and revised the remedy to provide for pay to the employees in lieu of reopening.

The arbitrator's revised award was rendered on November 24, 1982. DeSoto was ordered to comply with that award by order dated December 6, 1982, as modified on December 21, 1982. At the time of the arbitrator's November 24, 1982 revised award, approximately seven weeks remained before the CBA expired. At the time the district court's order of December 21 issued, approximately three weeks remained before the CBA ran out. Since February 4, 1982 the plant had been closed.

The question thus arises as to whether the issue of futility, which we have held is an arbitral concern, should be remanded to the arbitrator at this stage of the controversy. We think it would now be inappropriate to do so for the following reasons.

First, and most importantly, the circumstances that existed at the time the futility issue should have been remanded no longer exist. Indeed the present circumstances are even more drastically changed. As this opinion is written, in January, 1984, more than a year has elapsed since the CBA has expired. If the costs and practical problems which were alleged to have existed in November 1982 did indeed exist at that time, as the district court at least found, their effect now on reopening would be even more dramatic. Thus even if it would have been appropriate in November 1982 for the district court to have remanded the case to the arbitrator for a futility finding, and even if the arbitrator had at that time insisted on reopening as an appropriate remedy, the passage of time since then has given such a new shape to the surrounding circumstances that what may not have been futile then, is undeniably futile now. We cannot ignore the fact that there has been no contractual relationship between the parties for over a year, and that the plant has been closed for about two years. Nor can we ignore the economic costs that would be incurred as they may be relevant to the benefits possibly inuring to the Union and the purpose for which the Union desires reopening.[11] The district court, even though it did not require the arbitrator to determine the futility of his remedy, did express its concern that the employees would be far better served by having the company's economic resources allocated to their benefit rather than to a meaningless reopening. While we do not hold that this reasoning should excuse DeSoto's compliance with an otherwise valid award, we cannot help but recognize the validity of

---

11. At oral argument, Union counsel suggested at most that members would have restored to them the dignity of their jobs. We find this argument shallow and unconvincing.

the court's comments under the peculiar circumstances revealed by this record.

We also recognize that if we were now to direct the district court to remand to the arbitrator for a futility finding, the arbitrator, having amended his award to delete the remedy of reopening, would now be faced with a second order of the district court to reconsider at this time whether it would be futile to order reopening. He would be obliged to do so in light of circumstances as they existed at the time of the remand. Because he would also be obliged to consider the evidence that would be produced by the parties, the circumstances that have developed during the course of these proceedings, the expiration of the CBA, and DeSoto's announced determination to reopen, if at all, for only one day,[12] at whatever those costs may be, it appears to us that any decision that reopening would not be futile could not be supported under the *Honold* standard. The only rational conclusion that this record would support were the arbitrator to consider the issue *now,* would be that requiring reopening would serve no purpose. To enforce the arbitrator's original remedy now would be not only fruitless, but also punitive.

We are uncomfortably aware of the fact that if we hold the arbitrator to his modified award—that reopening is inappropriate—DeSoto might be said to have profited by delay (although we note that DeSoto is not itself responsible for the delay). *Cf. Brooks v. NLRB,* 348 U.S. 96, 104, 75 S.Ct. 176, 181, 99 L.Ed. 125 (1954) (employer cannot be permitted to delay certification of union and thereby diminish duration of duty to bargain). Here, however, we are not addressing the issue of a continuing relationship in a bargaining context but rather a remedy of reopening which appears from every standpoint to be purposeless. In such a situation we have no hesitancy in enforcing the arbitrator's reformulated remedy without the need for further remand.

The second arbitration award, issued when the district court held the reopening remedy to be irrational, required the payment of backpay damages, to the date of termination of the CBA (as a modification of the original backpay award), in lieu of reinstatement and reopening. Thus the arbitrator's orders, when read together, provided back pay from the date of closing (February 4, 1982) to the date the CBA expired (January 15, 1983). Since we hold that the original award cannot now be enforced, the arbitrator's second and modified award under the *Honold* and *Enterprise Wheel* standard will be sustained and we will enforce the judgment affirming that award.

### IV.

We will affirm so much of the district court's orders dated November 10 and entered November 12; dated December 6 and entered December 8; and dated December 21 and entered December 22, 1982 as uphold the arbitrator's decision that DeSoto violated the terms of the collective bargaining agreement. We will also affirm the orders dated December 6 and entered December 8, and dated December 21 and entered December 22 insofar as those orders enforce and require compliance with the arbitrator's second award.[13] Each party will bear its own costs.

---

12. At oral argument, counsel for DeSoto represented that this would be sufficient to constitute substantial performance of any imposed obligation to reopen, since there is no CBA. We express no opinion with respect to this argument.

13. In light of this disposition it would appear that there is no longer any need to continue the injunction that prohibits DeSoto from removing, selling, or transferring the Pennsauken plant and equipment, and other assets. If that injunction, as we believe it to be, is still in effect, it would appear to have served the purposes for which it was imposed. However, that issue is a matter to be addressed and decided by the district court in the first instance. We assume that whatever applications are indicated will be made to the district court with respect to the injunction.